# PAYNE

*v.*

# UNITED STATES EX REL. NATIONAL RAILWAY PUBLISHING COMPANY.

MANDAMUS; UNITED STATES MAIL; SECOND-CLASS MAIL MATTER; POSTAL REQUIREMENTS.

1. In all cases where it is sought by *mandamus* to compel a public officer to perform a certain act, the question is whether the act is of a ministerial or of a judicial character as those terms have been defined and limited by the courts, for there is no ministerial act to which the writ would be applicable that does not, in some measure and to some extent, involve the exercise of judgment and discretion, and there are acts apparently judicial which are not so in contemplation of law; *following* West v. Hitchcock, 19 App. D. C. 333.

2. By the act of Congress of March 3, 1879 (20 Stat. 355), Congress has not committed to the Postmaster-General, or to any one else, the matter of determining what should be carried in the mails as second-class matter and what as matter of the third class, but has reserved to itself that power exclusively, itself making the classifi-

cation; and it is not competent for the Postmaster-General to add anything to the statute or take anything from it.

3. A publisher who desires to have his publication carried in the mail as second-class mail matter, and who has fully and fairly complied with all of the requirements of the act of Congress of March 3, 1879 (20 Stat. 355), has acquired a legal right to have it so carried, enforceable by the writ of *mandamus* if the Postmaster-General arbitrarily or without legal reason refuses to receive and transmit such publication.

4. Section 276 of the postal laws and regulations promulgated by the Postmaster-General, defining second-class mail matter, is invalid so far as it superadds to the requirements of the act of Congress of March 3, 1879 (20 Stat. 355), classifying mail matter.

5. The writ of *mandamus* is properly issued to compel the Postmaster-General to admit to the mails as second-class mail matter a railway guide periodically published, where he has excluded it from the mail as second-class matter exclusively upon the ground of its failure to comply with the requirement of a postal regulation that it must "consist of current news;" that characteristic of second-class matter not being required by the act of Congress of March 3, 1879 (20 Stat. 355), classifying mail matter.

Mr. Justice SHEPARD *dissenting.*

No. 1231. Submitted November 7, 1902. Decided December 3, 1902.

HEARING on an appeal by the respondent, the Postmaster-General of the United States, from an order of the Supreme Court of the District of Columbia directing a peremptory writ of *mandamus* to issue to compel him to receive and transmit in the mails a certain publication as second-class mail matter.        *Affirmed.*

The COURT in the opinion stated the case as follows:

This is a suit instituted in the Supreme Court of the District for the issue of the writ of *mandamus* to require the Postmaster-General of the United States to admit into the mails, for transmission as second-class mail matter, a certain periodical publication issued by the appellee, the National Railway Publishing Company, which the Postmaster-General held to be mail matter of the third class. The pub-

lication in question is known as " The Official Guide of
the Railways and Steam Navigation Lines of the United
States, Porto Rico, Canada, Mexico and Cuba," published
monthly from the office of the relator in the city of New
York since June, 1900, under the foregoing name.  It ap-
pears that previously to June, 1900, it had been published
under the name of the " Travellers' Official Guide "; that
the relator became the owner of it by purchase in May, 1870;
that it was then published in the city of Philadelphia; that
in December of 1879 the office and place of publication were
removed to the city of New York, and have since there re-
mained; that during the whole time of its publication in
Philadelphia, that is, from May of 1870 to December of
1879, it was admitted into the mails there as second-class
mail matter, and recognized as such by the Postmasters-Gen-
eral of the United States for the time being; that on the re-
moval of the office of publication to New York, and there-
after from January 1, 1880, to November 18, 1901, it con-
tinued to be received and accepted by the postmaster at said
city and recognized by the several Postmasters-General of the
United States as second-class mail matter, and continued to
be conveyed as such in the mails.  The relator asserts that,
upon the faith of this recognition and acceptance of the pub-
lication as second-class mail matter, it invested large sums
of money in the enterprise, and greatly enlarged its business.
It seems to be admitted that the character of the publication
has never been changed, and that it is now in all respects
substantially what it was in 1870, 1880, and 1900.  It is the
well-known railway guide containing railroad and steam-
boat time-tables with much information concerning the move-
ments of the railroads, undoubtedly of special use to the
officials of the railroads, and of great general use to the
traveling public.

At the time of the admission of the publication as second-
class mail matter to the mails in New York in 1880, and
again upon the change of name in 1900, the relator received,
as seems to have been the custom and the regulation at the
time, special certificates authorizing the entry of the guide as

second-class matter; and the certificate of 1900 was issued apparently after special inquiry by the Third Assistant Post-master-General. On this last occasion the relator was directed to print on the publication: " Entered as second-class matter at the New York, N. Y., post-office (month and day) 1900."

The statute under which mail matter has been classified for the last twenty years and upwards, and which is yet in force, is the act of Congress of March 3, 1879 (20 Stat. 355). Its provisions, so far as they bear on the subject under consideration, are these:

" Sec. 7. That mailable matter shall be divided into four classes: *First,* written matter; *second,* periodical publications; *third,* miscellaneous printed matter; *fourth,* merchandise."

" Sec. 10. That mailable matter of the second class shall embrace all newspapers and other periodical publications which are issued at stated intervals, and as frequently as four times a year and are within the conditions named in sections 12 and 14."

" Sec. 12. That matter of the second class may be examined at the office of mailing, and if found to contain matter which is subject to a higher rate of postage, such matter shall be charged with postage at the rate to which the inclosed matter is subject: *Provided,* That nothing herein contained shall be so construed as to prohibit the insertion in periodicals of advertisements attached permanently to the same.

" Sec. 14. That the conditions upon which a publication shall be admitted to the second class are as follows:

" *First.* It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue, and be numbered consecutively.

" *Second.* It must be issued from a known office of publication.

" *Third.* It must be formed of printed paper sheets, without board, cloth, leather, or other substantial binding, such as distinguish printed books for preservation from periodical publications.

" *Fourth.* It must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry, and having a legitimate list of subscribers: *Provided, however,* That nothing herein contained shall be so construed as to admit to the second-class rate publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates."

" Sec. 17. That mail matter of the third class shall embrace books, transient newspapers and periodicals, circulars, and other matter wholly in print (not included in Sec. 12), proof sheets, corrected proof sheets and manuscript copy accompanying the same, and postage shall be paid at the rate of one cent for each two ounces or fractional part thereof, and shall fully be prepaid by postage stamps affixed to said matter."

Postage on mail matter of the second class is greatly lower than on that of any of the other classes, being now, by the act of Congress of March 3, 1885 (23 Stat. 387), only at the rate of one cent per pound.

It is matter of history that the privilege of transmitting periodical publications through the mails as second-class mail matter has been very greatly abused; and that successive Postmasters-General have protested to Congress against the abuse, and requested legislation on the subject, with the statement that the Post Office Department was powerless to prevent such abuse. Congress, however, seems to have paid no heed to these representations and remonstrances of the department, and to have been satisfied with the existing conditions. At last the department itself assumed to correct some of the alleged abuses; and on July 17, 1901, it formulated and issued a new postal regulation, which, it seems, was intended to have that effect. This regulation is in the following terms:

" Sec. 276, Postal Laws and Regulations, Edition of 1893, is hereby amended to read as follows:

" ' Sec. 276. *General Definition.*— Mailable matter of the second class shall embrace all newspapers and other period-

ical publications which are issued at stated intervals and as frequently as four times a year, and are within the conditions named in sections 12 and 14 (act of March 3, 1879, Sec. 10 — 20, Stat. 359). The sections referred to are 293 and 277. Second-class matter above described is of two kinds: 1. That sent by publishers or news agents (Sec. 299). 2. That sent by others than publishers or news agents (Sec. 302). Periodical publications herein referred to are held not to include those having the characteristics of books, but only such as consist of current news or miscellaneous literary matter, or both (not including advertising), and conform to the statutory characteristics of second-class matter.'

(Signed) " C. EMORY SMITH,

*Postmaster-General.*"

On November 18, 1901, presumably in execution of this regulation, the postmaster at New York notified the relator that by order of the Third Assistant Postmaster-General, to whom, it seems, in the distribution of business in the Post-Office Department this matter had been assigned, the certificate previously issued for the transmission of this railway guide through the mails as second-class matter had been revoked, and that thereafter the postage would be charged upon it as mail matter of the third class. Some negotiations ensued. The relator applied to the Third Assistant Postmaster-General for a withdrawal of his order, and a hearing was had in regard to it. Under date of December 3, 1901, the relator was notified, by letter from the Third Assistant Postmaster-General, that his appeal had been fully considered, and that the ruling was affirmed which excluded the guide from the category of second-class mail matter. In the letter it was added:

" The reasons for this action are that the primary and principal purpose of the publication is that of a reference book, and not that of ' current news or miscellaneous literary matter, or both ' (see the inclosed copy of amended Sec. 276, P. L. & R.). The value of your publication to railroad ticket agents and others is not questioned. In fact, because of its

value as a reference book, the Post-Office Department buys
many copies for its own use.   But it does not possess the
statutory characteristics of second-class mail matter."

From this decision of the Third Assistant Postmaster-Gen-
eral an appeal was taken by the relator to the Postmaster-
General; but the latter affirmed the ruling of the Third As-
sistant; and thereafter the department refused to receive the
railway guide and transmit it in the mails as second-class
mail matter, and required payment upon it as for mail mat-
ter of the third class.

Thereupon the relator instituted the present proceedings in
the Supreme Court of the District of Columbia, by the filing
therein of a petition for the writ of *mandamus* to constrain
the Postmaster-General to receive and transmit the guide
as second-class matter.   A rule to show cause was issued;
and a return was made thereto by the Postmaster-General,
the gist of which was, he was vested with discretion in the
premises, and that he acted in pursuance of this discretion.
To his answer upon the return there was a replication filed
by the relator.   Subsequently there was an agreed statement
of facts filed, substantially as herein recited; and upon the
pleadings and this agreed statement of facts it was stipulated
that the cause should be heard, and it was so heard.

Upon consideration of the cause, the court ordered the
peremptory writ of *mandamus* to be issued, in accordance
with the prayer of the relator's petition; and from this order
the Postmaster-General has appealed to this court.

*Mr. Ashley M. Gould,* United States Attorney for the Dis-
trict of Columbia, and *Mr. Henry H. Glassie,* Assistant, for
the appellant:

1. The legal character of the postal system and the power
and privileges exercised in relation to it have been the sub-
ject of frequent adjudication, as well by the Supreme Court
of the United States as by the circuit courts, and the prede-
cessor of the present court, the general term of the Su-
preme Court of the District.   It is believed that the follow-

ing propositions material to a decision of the present inquiry will be found to be fairly established by those adjudications: 1. The whole postal system rests upon the power (not duty) of Congress to establish post-offices and post-roads. *Dauphin* v. *Rey,* MacA. & M. 203, 209. 2. The power of Congress over the subject is plenary, absolute, and exclusive. *Ex parte Jackson,* 96 U. S. 727, 732. It is within its competency not only to exclude whole classes of matter, such as obscene, indecent, or immoral publications, letters concerning lotteries, gift enterprises, and fraudulent devices, but also to make the mailing of any such matter a criminal offense. *Ex parte Jackson,* 96 U. S. 727, 736; *In re Rapier,* 143 U. S. 110, 134. 3. Congress having absolute and exclusive power over the whole subject of what may be carried and what may be excluded, it is entirely within its competency to confer upon the Postmaster-General the authority to determine, upon evidence satisfactory to him, whether a particular body of mail is to be admitted or excluded and at which of the rates prescribed by law. *Enterprise Saving Co.* v. *Zumstein,* 67 Fed. Rep. 1000, 1005. The exercise of the authority thus conferred upon the Postmaster-General is not a duty purely ministerial, but one involving the exercise of judgment and discretion. Id. 4. There are no constitutional limitations in respect of these facilities offered by the postal service. They are not " privileges or immunities " within the sense of the Constitution. They are not subject to the rule of equality, as witness the franking privilege. *Dauphin* v. *Key,* MacA. & M. 211, 215. 5. They are not property in the constitutional sense of the term. They are mere privileges and conveniences gratuitously offered by Congress, not of right, but of grace. " They are not of that class that cannot be taken away without due process of law." Id.

2. One thing is evident: The term " periodical " in the act of March 3, 1879, has a meaning. There is more to a periodical than the mere external characteristic of periodical issuance from the press. This is the other and essential quality, present to the mind of the Postmaster-General as he administered the law, which is attempted to be expressed

in the regulation of July 17, 1901. But look at the statute from another point of view. . Let us apply another elementary rule, *noscitur a sociis*. *Virginia* v. *Tenne,* 148 U. S. 503, 519; *Reiche* v. *Smythe,* 13 Wall. 162, 164; Endlich Interp. Stats., Secs. 400, 401, and cases there cited. The statute says " *newspapers* and *other* periodical publications." The key word is " newspapers." " Other periodical publications " cannot be taken alone. They must be taken with " newspapers;" other periodical publications of the same general kind or character as newspapers.

Even a cursory examination of the prior legislation convinces one that the class of publications to which Congress has always wished to extend the benefits of this nominal, this subsidized postage, was the class which brings to its subscribers the news, the thought, the information of the day. The same purpose is manifested in this consolidating act of March 3, 1879. It was to quicken the intelligence of the people, to keep them abreast of what was being done and thought in the world, to make known the discoveries in the sciences and the arts, the improvements and advancements in special industries, that Congress then opened the mails to " newspapers and other periodical publications." It was not the purpose to do this for everything that could be put in print: for whole libraries of books, for city directories, for telephone guides, for advertisements of my wares, of your wares, of my steamboat line, or your railroad. It was for the benefit of everybody's business, not of your business or my business. In a word, to be a periodical, a publication must have three great characteristics: It must be general; public. It must contain information. It must be current. It must, in effect, be a newspaper or something of like kind with a newspaper. It may be a review, a weekly, a magazine, a medical journal, a law journal, but it cannot be a book. It cannot be a directory, a medical book, a law book.

3. If it be true that in order to come within the second class of mailable matter, a publication must have the essential and intrinsic, as well as the accidental and extrinsic, qualities of a periodical, then it was entirely competent for the

Postmaster-General, by his regulations of July 17, 1901, in determining whether a particular publication should or should not be carried as second-class matter, to look beneath its cover, beneath the mere surface of its serial name and serial number, and judge for himself whether it possessed in fact the characteristics of a genuine periodical, and what it was his power to do in one case it was his power to do in all cases. If he had the power as each case arose tacitly to apply this criterion, he had equally the power to formulate the criterion in words, both as statement of the ground of his action and as a guide for the conduct of those whom his advice might affect, for we must remember that the admissions to the second-class rate alone amount to thousands every year, and that the number of publications enjoying its benefits range into hundreds and thousands, and that all of these cases must be governed by uniform principles and rules. And not only that. Admissions to the second-class rate are made in the first instance by the postmaster at the respective places of publication, subject only to the review and supervision of the Third Assistant Postmaster-General. The necessity, then, for some plain and intelligible regulation or guide is doubly apparent. Our system of administration provides a familiar and well-established agency for the purpose — the Department regulation. The Postmaster-General is charged by law with the duties: " Second. To instruct all persons in the postal service with reference to their duties. * * * Ninth. To superintend generally the business of the Department and execute all laws relative to the postal service." Sec. 396, Rev. Stat. U. S. In the performance of these duties he is authorized to make regulations for the conduct of the public business. Sec. 161, Rev. Stat. U. S. Rules and regulations prescribed under this grant of authority for the transaction of the public business have the force and effect of law. *Gratiot* v. *U. S.,* 4 How. 80, 117; *Ex parte Reed,* 100 U. S. 13, 22; *Caha* v. *U. S.,* 152 U. S. 211, 218; *U. S.* v. *Bailey,* 9 Pet. 238, 255; *In re Kollock,* 165 U. S. 526, 533; *Hoover* v. *Salling,* 102 Fed. Rep. 716, 720. Even to the extent of making acts committed in violation of

such regulations crimes. *U. S.* v. *Bailey,* 9 Pet. 238, 255. And even though not constituting a requirement specifically binding to create a crime they may be perfectly valid and have the force of law. *Caha* v. *U. S.,* 152 U. S. 211, 220. The only limitation is that the regulation should not be inconsistent with law — that is, that it should be a reasonable and appropriate means for the execution of the law. For the universal practice and usage of legislation in this respect is simply to lay down the broad lines of the law, and to leave the development of the details to the executive officer charged with its execution and administration. *U. S.* v. *Macdaniel,* 7 Pet. 1, 14. It then becomes the duty of the executive branch " to make regulations in execution of, or supplementary to, but not in conflict with the statute." *Germania Iron Co.* v. *James,* 89 Fed. Rep. 811, 814. The question, then, is simply, *Is the regulation of July* 17, 1901, *consistent with the statute and a reasonable mode of carrying it into execution?* *Hoover* v. *Salling,* 102 Fed. Rep. 716, 720. Viewed in its proper relation to the statute, in the light of the true meaning of the term " periodical," it seems to us that the regulation of July 17, 1901, is not only consistent with the law, but an eminently reasonable and appropriate means of carrying it into effect according to its real intent and meaning. The refusal, therefore, to transport the petitioner's publication because its primary character was that " of a reference book and not that of current news or miscellaneous literary matter " is grounded upon the statute, is based upon a valid and intelligible reason, and is a legitimate exercise of the authority conferred upon the Postmaster-General.

4. The admission of publications to the second-class rate is not a ministerial, but a judicial act. TANEY, C. J., in *Decatur* v. *Paulding,* 14 Pet. 497.

The question before this court after all is not whether the Postmaster-General is correct in his interpretation of the law governing the second and third-class rates and marking the distinction between them; nor is the question whether the

Postmaster-General is correct in his finding of fact that the petitioner's publication has the characteristics of a book.

The only question is whether or not the determination that the petitioner's publication belongs to the third rather than the second class is one which involves the exercise of judgment and discretion. For the law is perfectly well settled that the power to direct or control, by *mandamus* or injunction, the action of the head of an executive department in the administration of the laws exists only when the action sought to be controlled is a certain definite ministerial act involving the exercise of no judgment or discretion. *Seymour* v. *U. S. ex rel. South Carolina*, 2 App. D. C. 240, 245; *Long* v. *Lochren*, 6 App. D. C. 484, 505; *Am. School Mag. Healing* v. *McAnnulty, Postmaster*, 102 Fed. Rep. 565; *Gaines* v. *Thompson*, 7 Wall. 347; *City of New Orleans* v. *Paine*, 147 U. S. 261, 264; *Noble* v. *Union River Logging Co.*, 147 U. S. 165, 176, 177. And the judgment, thus free from judicial interference or control, may have been exercised either in the construction of law, as in *U. S. ex rel. Dunlap* v. *Black*, 128 U. S. 40, 45; *Decatur* v. *Paulding*, 14 Pet. 497, 499. Or it may have been exercised in ascertaining and determining a question of fact, as in *U. S.* v. *Seaman*, 17 How. 225. Or it may have been exercised in deciding what is called a mixed question of law and fact, as in *Am. School Mag. Healing* v. *McAnnulty*, 102 Fed. Rep. 565, 567.

The principle underlying all of these cases is that the court can only command a thing to be done when the statute commands it to be done, and in the same manner. Consequently, when the statute does not peremptorily command it to be done, but requires an executive officer to exercise his mental faculties to find out whether it should or should not be done, the court can only command him to exercise his mental faculties, and if he has exercised them in one way the court cannot command him to exercise them in another. In no case can the writ of *mandamus* " be made to perform the functions of a writ of error." *Holloway* v. *Whitelay*, 4 Wall. 522. It follows, then, that if the act be one requir-

ing the exercise of judgment or discretion, whether in the ascertainment of fact or the interpretation of law, it makes no difference " how gross an error may be committed or however ill-advised the action of the executive officer may be." *Seymour* v. *South Carolina,* 2 App. D. C. 240, 245. It cannot be distinguished from the analogous function performed by the Commissioner of Pensions or the Secretary of the Interior in deciding into which of several classes of pensionable disability a particular application falls; and this function has been declared both by this court and the Supreme Court of the United States to be one necessarily involving the exercise of judgment, notably in the cases of *Dunlap* v. *Black,* 128 U. S. 40, 45, 245; *Lochren* v. *Long,* 6 App. D. C. 486, 505, 506. See also *U. S. ex rel. Beverly Tucker* v. *A. G. Seaman, Superintendent of Public Printing,* 17 How. 225; *New Orleans* v. *Paine,* 147 U. S. 261, 264. If the action of the Postmaster-General is the result of a *bona fide* construction of law, however erroneous, it cannot be controlled. The court has no power to impose its own construction upon him. *Decatur* v. *Paulding,* 14 Pet. 497. Its function is limited to determining whether he is acting within the scope of his authority. It can interfere only when the action is obviously beyond the limitations of the law, in clear conflict with it, or is a manifest addition amounting to new legislation. This is the principle which governs the decisions upon departmental regulations such as *Morrell* v. *Jones,* 106 U. S. 466; *Kurtz* v. *Moffitt,* 115 U. S. 487; *Anchor* v. *Howe,* 50 Fed. Rep. 367, in all of which the action set aside consisted in a plain and manifest alteration and departure from the statute. See *Hoover* v. *Salling,* 102 Fed. Rep. 716, 720. Some support for the view of the petitioner is sought to be drawn from the recent case of *West* v. *Hitchcock,* 19 App. D. C. 333. If we are correct in our understanding of that case, it does not, or purport to, depart from or add anything to the doctrine announced in the leading case of *U. S. ex rel. Bride* v. *Schurz,* 102 U. S. 378, 396. The point decided in that case was that whenever upon a decision by the Land Department that a party is entitled to a patent, a patent is

duly executed and recorded (though not delivered), such record being a solemn public act, operates as an " assurance by matter of record " to vest title in the applicant without delivery. The subsequent delivery of the patent, therefore, being reduced to a mere ministerial act, may be compelled by *mandamus.* *U. S. ex rel. Bride* v. *Schurz,* 102 U. S. 378, 397–399. The doctrine of the Schurz case is followed in *Noble* v. *Union River Logging Co.,* 147 U. S. 165, 176, 177; *New Orleans* v. *Paine,* 147 U. S. 261, 264; *Brown* v. *Hitchcock,* 173 U. S. 473. See also *McCormick* v. *Aultman,* 169 U. S. 606, 609. Some expressions in the case of *Roberts* v. *U. S.,* 176 U. S. 222, are likewise relied on by the petitioner. But an examination of that case will show that the court did not in anywise weaken the repeated adjudication upon the subject of controlling the action of executive officers by *mandamus.* In the view taken by the Supreme Court the action of the treasurer, Roberts, was a mere ministerial duty imposed upon an executive officer, " which duty he is bound to perform without any question." *Roberts* v. *U. S.,* 170 U. S. 222, 230.

5. The admission of a publication to the second-class rate by one Postmaster-General does not preclude his successor, when it is offered for transmission thereafter, from determining its true character and class according to his own judgment. *Dauphin* v. *Key,* MacA. & M. 208, 211, 218–224; *U. S.* v. *Macdaniel,* 7 Pet. 1, 14; *Lochren* v. *Long,* 6 App. D. C. 486. The plain intention of Congress is that all publications of the same character shall be transported at the same rate. And one Postmaster-General could not, by the terms in which he should happen to couch an instrument of his own devising, create rights which would destroy that conformity. His acts are valid only when within the limitations of his express authority. *Whiteside* v. *U. S.,* 93 U. S. 247, 257; *Hawkins* v. *U. S.,* 96 U. S. 689, 691; *The Floyd Acceptances,* 7 Wall. 666, 676. As it could not be the effect, so it cannot be the purpose of the certificate of entry to create any such obligation. But it will also be observed that the certificate under which the petition-

er's publication had been transported from June, 1900, until the institution of the proceedings provided distinctly that it was valid only *until revoked.*

6. The Postmaster-General is not bound by the construction placed upon the statute by his predecessor. *Fairbank* v. *U. S.,* 181 U. S. 284, 308, 310. It is plainly within the power of this court to construe this statute for itself. If, when it has done so, the court has no doubt about it, there is an end of the matter. If, on the contrary, the court finds itself in doubt it can attach to the construction of the statute, apparently implied in the admission of the petitioner's publication, such weight as it is justly entitled to; but it will not adopt that construction against the plain intention of Congress. But when the court has reached a conclusion as to the true construction, whether it be the same as that of a former Postmaster-General or not, it by no means follows that it is empowered to impose that construction upon the present Postmaster-General. While the courts are empowered to construe the acts of Congress whenever they are involved in cases properly before them, this does not confer the power to create a case for the very purpose of making such construction. If the statute be one which an executive officer must exercise judgment and discretion in order to administer, the construction of it is a part of his administrative duty. *Decatur* v. *Paulding,* 14 Pet. 497, 515. It is submitted that whatever may be the opinion of this court as to the true construction of the statute in question, it is without power to use the writ of *mandamus* to impose that construction upon the Postmaster-General.

7. The continuance of petitioner's proceeding, after its admission to the mails as second-class matter, cannot estop the United States from ascertaining its true character and classifying it accordingly. Nothing would seem to be better settled than that no right, not directly created by law, can arise against the United States by estoppel based upon the acts or conduct of its officers. *The Floyd Acceptances,* 7 Wall. 666, 676; *Whiteside* v. *U. S.,* 93 U. S. 247, 257. Estoppels should be mutual. The United States, it is said, hav-

ing once carried this publication at the second-class rate, are compelled, because we have continued to publish it, to continue so to carry it. But there is no corresponding obligation upon the publisher. Five months or five minutes after the admission of his publication he could have discontinued it. Could it be said that an express company, having once carried a publication at a particular rate, must be estopped, by the mere continuance of the publication, from charging upon it a higher rate? Obviously not. It could be prevented from charging a higher rate only by a contract not to do so — by a contract to carry at the same rate for a definite term. Again, if the continued publication and investment of capital create an estoppel upon the United States, the estoppel should be good against the United States as a legal entity. If rights have accrued to the petitioner because, relying on its admission, it has expended large sums and built up a valuable property dependent upon that admission, then those rights ought to be secure against invasions by whatsoever authority. Yet it must be admitted that, in the twinkling of an eye, Congress can annihilate them. It can make the second-class rate five times as great as the third-class rate; it can abolish the second-class rate; it can abolish the whole postal system. The supposed estoppel, then, is not good against the United States. Against whom, then, is it good?

All these considerations serve only to show that the distribution and transportation of mail matter is a continuous administrative function, and that the power and duty of the Postmaster-General to supervise and administer the admission to the second-class rate is a general and continuous power and duty.

*Mr. Nathaniel Wilson, Mr. J. H. McGowan,* and *Mr. Clarence R. Wilson* for the appellee.

Mr. Justice MORRIS delivered the opinion of the Court:.

The principal question here, as in all cases of this character, is whether the act sought to be performed is of a ministerial or

of a judicial character, as those terms have been defined and limited by the courts. For, as pointed out in the case of *United States ex rel. West* v. *Hitchcock,* 19 App. D. C. 333, there is no ministerial act to which the writ of *mandamus* would be applicable that does not in some measure and to some extent involve the exercise of judgment and discretion, and there are acts apparently judicial which are not so in contemplation of law. An act may be ministerial in this connection, although it may occur in the course of judicial proceedings, or in the exercise of discretionary power, when it is merely a ministerial thing to be done after the judicial authority over the subject-matter has been exercised. Such was the matter of the issue of a patent in the case of *Butterworth* v. *Hooe,* 112 U. S. 50; the approval of an allotment of land in the case of *United States ex rel. West* v. *Hitchcock,* 19 App. D. C. 333, and similar acts in other cases which can readily be recalled.

It is very clear that the Congress of the United States has not committed to the Postmaster-General, or to any one else, the matter of determining what should be carried in the mails as second-class matter, and what as matter of the third class. It has reserved that power exclusively to itself. It has itself made the classification; and it is not competent for the Postmaster-General to add anything to the statute or to take anything from it. It may be that the classification has not been made with all the definiteness that is desirable. It may be, even, that the privilege of the mails has been grossly abused by the introduction into them of mail matter of the second class which was never anticipated by Congress. If, as alleged in the pleadings, the cost of transmission of the relator's periodical through the mails as second-class matter has been only forty cents per number a year, and the cost of such transmission to the Government has been two dollars a year, while the cost of its transmission as third-class matter is the sum of three dollars and twelve cents a year, there would seem to be some inequality with which Congress should deal; yet it is not the province of the Postmaster-General to

remedy the evil, if evil there is, by a postal regulation, or by unwarranted interpretation of the law.

The citizen who desires to have his publication carried in the mails of the United States as second-class mail matter, and who has fully and fairly complied with all the require- ments of the statute in regard thereto, has acquired a positive legal right to have it so carried; and his right will be en- forced by the writ of *mandamus,* if the Postmaster-General arbitrarily or without valid legal reason refuses to receive and transmit such publication. Of course the Postmaster- General and his subordinates are required to use judgment and discretion, and it may sometimes be a matter of much difficulty to identify a publication as one included in the category prescribed by Congress. But their discretion is limited to this question of identification; and it is not com- petent for them to impose additional requirements beyond those specified in the statute.

The postal regulation of July 17, 1901, under which it was sought to exclude the relator's publication from the category of second-class mail matter, is clearly in excess of the statute. It prescribes conditions which the statute does not prescribe. It is provided by the statute that period- ical publications, in order to be admitted as second-class mail matter, " *must be originated and published for the dissemina- tion of information of a public character, or devoted to litera- ture, the sciences, arts, or some special industry.*" The regu- lation restricts such publications to " *such as consist of cur- rent news or miscellaneous literary matter.*" It wholly omits and excludes periodicals devoted to the sciences, arts, or some special industry. Now, it may be that the words " *mis- cellaneous literary matter* " might be construed to mean the same thing as periodicals *" devoted to literature "*; but cer- tainly " *current news* " is not the equivalent of " *informa- tion of a public character.*" The regulation would restrict the second-class mail matter to the daily and weekly papers which disseminate " *current news* "; but undoubtedly the information conveyed by the relator's guide, a copy of which has been filed in the proceedings as an exhibit, is informa-

tion of a public character, most useful not only to those immediately connected with the railroad and steamboat transportation of the country, but likewise to the traveling public. And yet this is excluded by the regulation.

It is true that the regulation also provides that the publications to be admitted as second-class mail matter shall " conform to the *statutory* characteristics of second-class matter." But if the regulation means anything at all, or is intended to have any meaning, it is to superadd to the statutory characteristics another or other requirements not prescribed by the statute. This cannot lawfully be done.

What the Supreme Court of the United States said in the case of *Morrill* v. *Jones,* 106 U. S. 466, is applicable here. It appeared in that case that an act of Congress authorized the importation into the United States free of duty, of " animals alive, specially imported for breeding purposes from beyond the seas "; and that the Secretary of the Treasury, construing the act for himself, published a treasury regulation whereby he instructed collectors, that before admitting such animals from abroad, they should be satisfied that the animals were of superior stock, and adapted to improve the breed in this country. The Supreme Court said, in regard to this regulation:

" The Secretary of the Treasury cannot, by his regulations, alter or amend a revenue law. All he can do is to regulate the mode of proceeding to carry into effect what Congress has enacted. In the present case we are entirely satisfied that the regulation acted upon by the collector was in excess of the power of the secretary. The statute clearly includes animals of all classes. The regulation seeks to confine its operation to animals of ' superior stock.' This is manifestly an attempt to put into the body of the statute a limitation which Congress did not think it necessary to prescribe. Congress was willing to admit, duty free, all animals specially imported for breeding purposes; the secretary thought this privilege should be confined to such animals as were adapted to the improvement of breeds already in the United States. In our opinion, the object of the secretary could only be ac-

complished by an amendment of the law. That is not the office of a treasury regulation."

The Postmasters-General, who for many years have been appealing to Congress for some remedy for what they designate as an abuse of the second-class mail matter system, seem also to have been of opinion that they were without authority to remedy the evil by a postal regulation. It is unnecessary for us, in the present case, to decide how far their action and their view and construction of the law are binding, if at all, upon their successors. But even if we assume that the matter now comes up for consideration for the first time, and that the Postmaster-General is now for the first time called upon to make regulations to carry the statute into effect, we are clearly of opinion that the postal regulation of July 17, 1901, so far as it assumes to add to the requirements of the statute in regard to second-class mail matter, is in excess of his authority, and of no validity in law.

It is conceded that the relator has complied with all the requirements of the statute, and that the characteristics of its publication are literally and specifically as therein prescribed; and it appears that the exclusion of the periodical from the mails as second-class matter is based exclusively and in express terms upon its failure to comply with the superadded requirement of the postal regulation that it must " *consist of current news.*" Under the doctrine of the cases of *Butterworth* v. *Hooe,* 112 U. S. 50; *United States* v. *Schurz,* 102 U. S. 378; *Dunlap* v. *Black,* 128 U. S. 40; *Roberts* v. *United States,* 176 U. S. 221; *American School of Magnetic Healing* v. *McAnnulty,* at the present term (October, 1902) [187 U. S.] ; *United States* v. *Hitchcock,* 19 App. D. C. 333, and other cases, we must hold that the ground of exclusion is insufficient in law, and that the relator is entitled to the writ of *mandamus* for the enforcement of its right in the premises.

Very greatly to the point is the case just cited of the *American School of Magnetic Healing* v. *McAnnulty,* decided November 17, 1902, by the Supreme Court of the United States at its present term. There the Postmaster-General of the

United States, called upon to construe and enforce the act of Congress of September 19, 1900, to prevent the use of the mails for the collection of money by false and fraudulent devices, directed the exclusion from the mails of letters addressed to or intended for the American School of Magnetic Healing, an organization established at Nevada, in the State of Missouri, for the cure of all human ailments by mental or magnetic processes. There was great plausibility in his course; and he was undoubtedly called upon to exercise a certain amount of judgment and discretion in the application of the law. But the Supreme Court, by Mr. Justice PECKHAM, said:

" That the conduct of the post-office is a part of the administrative department of the Government is entirely true, but that does not necessarily and always oust the courts of jurisdiction to grant relief to a party aggrieved by any action of the head or one of the subordinate officials of that department which is unauthorized by the statute under which he assumes to act. The acts of all its officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief.

" * * * Here it is contended that the Postmaster-General has, in a case not covered by the acts of Congress, excluded from the mails letters addressed to the complainants. His right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exist then he cannot exclude or refuse to deliver them. Conceding, *arguendo,* that when a question of fact arises, which, if found in one way, would show a violation of the statutes in question in some particular, the decision of the Postmaster-General that such violation had occurred, based upon some evidence to that effect, would be conclusive and final, and not the subject of review by any court, yet to that assumption must be added the statement that if the evidence before the Postmaster-General, in any view of the facts, failed to show any violation of a Federal law, the determination of that official that such violation ex-

isted would not be the determination of a question of fact, but a pure mistake of law on his part, because the facts being conceded, whether they amounted to a violation of the statutes, would be a legal question, and not a question of fact. Being a question of law simply, and the case stated in the bill being outside of the statutes, the result is that the Postmaster-General has ordered the retention of letters directed to the complainants in a case not authorized by those statutes. To authorize the interference of the Postmaster-General, the facts stated must in some aspect be sufficient to permit him under the statutes to make the order.

" The facts, which are here admitted of record, show that the case is not one which by any construction of those facts is covered or provided for by the statutes under which the Postmaster-General has assumed to act, and his determination that those admitted facts do authorize his action is a clear mistake of law as applied to the admitted facts, and the courts, therefore, must have power in a proper proceeding to grant relief. Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law and is in violation of the rights of the individual. Where the action of such an officer is thus unauthorized he thereby violates the property rights of the person whose letters are withheld. * * *

" * * * Although the Postmaster-General had jurisdiction over the subject-matter (assuming the validity of the acts) and therefore it was his duty upon complaint being made to decide the question of law whether the case stated was within the statute, yet such a decision being a legal error does not bind the courts."

It seems to us that this case is decisive of that now before us.

The order appealed from will therefore be affirmed, with costs, and the cause will be remanded to the Supreme Court of the District of Columbia to carry the same into effect. And it is so ordered.

Mr. Justice SHEPARD dissenting:

Demands upon my time permit only a brief statement of the reasons why I cannot yield my assent to the judgment awarding the writ of *mandamus* in this case.

I am not unmindful of the weight that ought to be given, not only by the courts but by the succeeding heads of executive departments, to the long-continued practice of a department involving the interpretation of a law prescribing its regularly recurring duties in respect of the administration of an agency intrusted to it. But that the head of such a department has the right, in his own administration, to reverse the practice of his predecessors whenever, in his judgment, that practice has not been founded on a correct interpretation of the law, I have no doubt.

Save as to a subject-matter finally closed and settled under the former practice, and which thereby takes on the nature of a vested right of property, the rulings on which that practice is founded contain no element of estoppel or *res judicata* as the doctrines thereof are applicable in judicial proceedings.

It is proper to say here, however, that this proposition is not denied in the opinion of my brethren.

I agree that where the law directs the performance of a specific act, the facts of which are plain, the executive officer cannot escape the obligation by raising a question of construction merely: his duty does not cease to be ministerial because, to some slight extent, he must give interpretation to the law. This is what I understand to be the salutary doctrine enounced in *Roberts* v. *U. S.,* 176 U. S. 221; S. C., *Roberts* v. *Valentine,* 13 App. D. C. 38.

But when the ruling of the departmental chief does not involve a mere question of obedience to a law commanding in reasonably plain terms a duty to be performed in a particular case, and necessarily requires investigation of the special facts relating to each particular case that shall be presented for the application of a law couched in general terms, a very different condition arises.

A discretionary duty is then imposed, and its exercise is not subject to judicial control: it is only politically examinable and parties aggrieved must look to the legislative branch for relief.

I do not consider that we are called upon, in this case, to determine whether the item of the new regulation relating to mail matter of the second class, is narrower than the terms of the statutes justify; because the Postmaster-General, on the appeal from the decision of his assistant, based his decision, not upon the regulation as expressing the entire meaning of the law, but upon the broad ground that the facts showing the nature, purposes, and manner of publication of relator's alleged periodical did not bring it within the privilege of the law. In my opinion, the duty of determining whether the railway guide was, under all these facts, a periodical publication of the second class as defined in sections 12 and 14, or one of the third class as defined in section 17 of the statute, was not ministerial simply, but *quasi* judicial.

The Congress did not deem it advisable to admit all of the periodical publications of the country to the second-class mail privilege. On the other hand it did not define with perfect precision the line of separation between those admitted and those excluded. When, therefore, a new publication is presented for carriage at second-class rates, the Postmaster-General is bound to make inquiry and pass upon the right. This necessarily involves the exercise of discretion.

Were it in our power to review his decision in the present case, I would not be prepared to say that it was erroneous — at least not clearly so.

There are two general kinds of periodicals mentioned in the statutes; one belongs to the second class, the other to the third.

The railway guide is not necessarily a periodical of the second class, although it conforms to the conditions of the first, second, and third clauses of section 14. Coming then to the fourth clause, though it has a legitimate subscription list it is not " devoted to literature, the sciences, arts, or some special industry." Its claim depends, then, upon whether it " be originated and published for the dissemination of

information of a public character." It does contain information for those who travel beyond the limits of local transportation lines; but whether this limited use by only a part of the public, and a relatively small part, answers the requirement of the statute is a subject of grave doubt, to say the least.

Granting the value of the book — for such it practically is — as one of reference for those engaged in general or distant travel, it must nevertheless be borne in mind that the succeeding numbers published and mailed, do not, like the ordinary periodical of subscription issue, consist of entirely new matter for the information of the public.

The great bulk of the matter carried from date to date of successive issue is old. Most of it has been carried time and again and delivered to the same subscribers; for all that the later issue undertakes to do is to note such changes in schedules, or such new ones as may have occurred since the next preceding issue.

Without pursuing the subject further, I am of the opinion that the judgment should be reversed and the petition dismissed.

A writ of error to the Supreme Court of the United States was prayed and allowed.

