**INSTITUTE FOR SCIENTIFIC INFOR-
MATION, INC., Appellant,**

v.

**UNITED STATES POSTAL SERVICE.**

No. 76–2055.

United States Court of Appeals,
Third Circuit.

Argued March 29, 1977.

Decided May 5, 1977.

Irving R. Segal, Kimber E. Vought, John E. McKeever, Philadelphia, Pa., for appellant; Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel.

David W. Marston, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Section, William J. McGettigan, Asst. U. S. Atty., Philadelphia, Pa., for appellee; Arthur S. Cahn, Asst. Gen. Counsel, Rate Application Division, U. S. Postal Service, of counsel.

Before SEITZ, Chief Judge, and ALDISERT and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

On this appeal from summary judgment in favor of the United States Postal Service, the issue presented is whether issues of "Current Contents", publications by the appellant Institute for Scientific Information [ISI], constitute "periodical publications", and thus qualify for second class mailing privileges, within the meaning of former 39 U.S.C. §§ 4351 and 4354.[1] After the Postal Service revoked the then-existing second class status of the "Current Contents" publications, ISI appealed to the chief administrative law judge of the Postal Service for reinstatement of the original classification. On May 22, 1975, the ALJ upheld the revocations and denials of second class status. The Postal Service's judicial officer subsequently upheld the revocations and denials, making this the final decision of the Postal Service. The court below upheld the Postal Service's determination on the basis that the ISI publications were not "periodical publications" within

the standards enunciated in *Houghton v. Payne,* 194 U.S. 88, 24 S.Ct. 590, 48 L.Ed. 888 (1904), addressing the requirements necessary for second class mailing status. Because we determine that issues of "Current Contents" demonstrate the essential attributes of a periodical, we reverse.

I.

Issues of "Current Contents" are paperbound publications published weekly in Philadelphia, Pennsylvania for subscribers. Described by their publisher as "an effective and economic solution of the treble problem of literature scanning, reading selection, and rapid dissemination of information," the publications are designed primarily to alert subscribers to recently published articles in various scientific fields. An editorial board reviews scientific and technical journals within each publication's specific field and lists in the appropriate issue the articles contained in recent journals deemed worthy of inclusion; the "listing" is accomplished by reproducing, with minor variations, the tables of contents of included journals. In addition to the lists of articles from selected journals, each issue of "Current Contents" contains an editorial article and editorial comments on recent articles appearing in popular journals.

A second class mailing permit for "Current Contents—Life Sciences" was issued on January 19, 1961. Subsequently, four other publications ("Current Contents—Behavioral, Social & Educational Sciences"; "Current Contents—Physical & Chemical Sciences"; "Current Contents—Engineering & Technology"; and "Current Contents—Agriculture, Food & Veterinary Sciences") were issued second class mailing privileges by the Post Office Department. On May 14, 1971, the Post Office Department proposed to revoke the second class status of "Current Contents—Behavioral, Social & Educational Sciences," and on June 17, 1971, the Department proposed

1. In June 1976, the Governors of the Postal Service adopted a new mail classification scheme, pursuant to 39 U.S.C. §§ 3623(a), 3625.

The previous classification system regarding second class mail, 39 U.S.C. § 4351 *et seq.,* was retained.

revocation for the remaining four publications. Applications for second class permits for two other publications ("Current Contents—Clinical Practice" and "Current Contents—Life Sciences") were denied by the Postal Service on April 12, 1973, and July 6, 1973, respectively.

## II.

Throughout the proceedings, both sides have agreed that other than the basic issue of whether "Current Contents" are "periodical publications," each publication meets all other requirements for second class mailing privileges.[2] The Postal Service argues, and the district court agreed, that any analysis of whether the publications are "periodical publications" is controlled by a passage from *Houghton v. Payne, supra* :

> A periodical, as ordinarily understood, is a publication appearing at stated intervals, each number of which contains a variety of original articles by different authors, devoted either to general literature of some special branch of learning or to a special class of subjects.

194 U.S. at 97, 24 S.Ct. at 592. This approach to judicial decision-making raises a fundamental inquiry into the anatomy of a precedent.

## A.

In ascribing controlling authority to the single *Houghton* passage, the Postal Service tries its hand at a classic legal reasoning form.[3] It begins with a major premise that all periodical publications require "a variety

of original articles by different authors"; it supplements this with a minor premise that "Current Contents" have neither original articles nor different authors; and it concludes that "Current Contents" are not periodical publications. But notwithstanding logical form, there can be no truth to a conclusion drawn from an incorrect premise. If the major premise is invalid— if it is not a *bona fide* rule of law—the syllogistic house collapses. Thus, we must critically examine whether the statement lifted from *Houghton* is the rule of that case, or merely an expression extracted from the Court's *ratio decidendi*.

## B.

▮ Upon close analysis, we cannot conclude that the *Houghton* statement qualifies as a rule of law in the classic Poundian sense: a legal precept "attaching a definite legal consequence to a definite, detailed state of facts."[4] For in *Houghton*, the issue facing the court was whether a given publication was a book or a periodical. The rule of the case is that periodical publications, as defined in the Post Office bill of March 3, 1879, do not include books which are complete in themselves and which have no connection with each other, despite the fact that they are bound in paper, issued at stated intervals more than four times a year, numbered consecutively, and bear dates of issue. And beyond the distinguishable factual complex, we reach yet another, crucial level of analysis: In construing the

---

**2.** Former 39 U.S.C. § 4354 provides, in relevant part:

> *Conditions for entry of publications*
> (a) Generally a mailable periodical publication is entitled to be entered and mailed as second class mail if it—
> (1) is regularly issued at stated intervals as frequently as four times a year and bears a date of issue and is numbered consecutively;
> (2) is issued from a known office of publication;
> (3) is formed of printed sheets;
> (4) is originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or a special industry; and
> (5) has a legitimate list of subscribers.

**3.** *See* Levi, *An Introduction to Legal Reasoning*, 15 U.Chi.L.Rev. 501, 501–02 (1948):

> The basic pattern of legal reasoning is reasoning by example. It is reasoning from case to case. It is a three-step process described by the doctrine of precedent in which a proposition descriptive of the first case is made into a rule of law and then applied to a next similar situation. The steps are these: similarity is seen between cases; next the rule of law inherent in the first case is announced; then the rule of law is made applicable to the second case.

**4.** Pound, *Hierarchy of Sources and Forms in Different Systems of Law*, 7 Tul.L.Rev. 475, 482 (1933).

statutory expression "periodical publication," the *Houghton* Court interpreted it to mean "that it shall not only have the feature of periodicity, but that it shall be a periodical in the ordinary meaning of the term." 194 U.S. at 96, 24 S.Ct. at 592. This approach comports with the Court's well-established guideline: "Statutory words are uniformly presumed, unless the contrary appears, to be used in their ordinary and usual sense, and with the meaning commonly attributed to them." *Caminetti v. United States*, 242 U.S. 470, 485–86, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). Mindful of the Court's teachings, we believe that the chief administrative law judge, the judicial officer and the district court all placed too much emphasis on a truncated excerpt from the *Houghton* Court's construction of the statute. A more complete understanding of the "ordinary" meaning of the term "periodical" is derived from a thorough reading of the *Houghton* Court's discussion:

A periodical, as ordinarily understood, is a publication appearing at stated intervals, each number of which contains a variety of original articles by different authors, devoted either to general literature of some special branch of learning or to a special class of subjects. Ordinarily each number is incomplete in itself, and indicates a relation with prior or subsequent numbers of the same series. It implies a continuity of literary character, a connection between the different numbers of the series in the nature of the articles appearing in them, whether they be successive chapters of the same story or novel or essays upon subjects pertaining to general literature. If, for instance, one number were devoted to law, another to medicine, another to religion, another to music, another to painting, etc., the publication could not be considered as a periodical, as there is no connection between the subjects and no literary continuity. It could scarcely be supposed that ordinary readers would subscribe to a publication devoted to such an extensive range of subjects.

A book is readily distinguishable from a periodical, not only because it usually has a more substantial binding, (although this is by no means essential,) but in the fact that it ordinarily contains a story, essay or poem, or a collection of such, by the same author, although even this is by no means universal, as books frequently contain articles by different authors. Books are not often issued periodically, and, if so, their periodicity is not an element of their character.

194 U.S. at 97–98, 24 S.Ct. at 592.

The conclusion which emerges from a thorough reading is that although the court made reference to a periodical's ordinarily containing "a variety of original articles by different authors," this characteristic was just one factor considered by the court, not an absolute litmus test as urged by the Postal Service. Thus, while identifying the characteristic as one indicative of a periodical, the Court could also state that *books* "frequently contain articles by different authors."

More significant, in our view, were those elements which may properly be described as "essential attributes of a periodical." In addition to discussing characteristics found to be true of *both* books and periodicals, *Houghton* emphasized that two phenomena inhere in periodicals alone: (1) each issue is usually incomplete in itself, and (2) the issues demonstrate a continuity of literary character, "a connection between the different numbers of the [same] series." If a definitive test is to emerge from the *Houghton* analysis, therefore, we think that the Postal Service must not be concerned with the originality of a periodical's literary content or a body count of its authors so much as with a nexus of the contents to periodicity, *i. e.*, a recognized relationship between the various numbers and the continuity or connection between them.

We note that this approach goes beyond any notion of "inherent periodicity" which suggests, through a process of exceedingly circular reasoning, that any publication issued at periodic intervals must be a "periodical publication." *Houghton* foreclosed

such a contention;[5] the factor may be considered in ascertaining a publication's "essential attributes" but, as with the factors relating to the number of articles and authors, its importance pales in light of the broader analysis defined above.

### C.

We specifically reject the chief administrative law judge's reliance on what he interpreted to be a definition which has been "consistently followed by the Courts and by the Postal authorities through the years." *In Re Institute for Scientific Information, Inc.*, P.S. Docket Nos. 2/60–64, 70, 82 & 114 (May 22, 1975), at 22. No court decisions other than *Houghton* were cited for this assertion. Indeed, the only other court decision cited in the ALJ's opinion was *Payne v. United States*, 20 App.D.C. 581 (1902), *appeal dismissed* 192 U.S. 602, 24 S.Ct. 849, 48 L.Ed. 583 (1904), in which the court treated railroad timetables as periodical publications entitled to second class mailing status. The ALJ treated the railway guide exception, as well as a similar exception fashioned for bus guides in *National Publishing Co., Inc.*, P.O.D. Docket No. 3/5 (1969), as acceptable "for reasons of public policy." ALJ Opinion, *supra*, at 25. As for the Postal Service's "consistent" application of the definition advanced, we note that issues of "Current Contents" were granted second class mailing status for years prior to the revocations. *Houghton* itself provides the best response to any argument regarding past practice:

> Contemporaneous construction is a rule of interpretation, but it is not an absolute one. It does not preclude an inquiry by the courts as to the original correctness of such construction. A custom of the department, however long continued by successive officers, must yield to the positive language of the statute.

194 U.S. at 99–100, 24 S.Ct. at 593.

### III.

▋▋▋ Actions of the Postal Service are ordinarily subject to reversal only when they fall outside the scope of the administrator's authority, when they are arbitrary or capricious, or when they are unconstitutional. *See American Bible Society v. Blount*, 446 F.2d 588, 596–98 (3d Cir. 1971). In the posture of this case, both parties agree that the narrative or historical facts are undisputed and that the ultimate determination of mailing status depends solely upon interpretation of the relevant statutory provisions. While we recognize the deference ordinarily due to the administrator's decisions, that deference is not of the same character where the question is purely one of law and does not implicate the administrator's expertise. This is particularly true where, as here, the administrator's legal decision is based on his interpretation of a judicial opinion that in turn construes a statute. In light of our reading of the proper requirements, we conclude that the district court, the judicial officer, and the ALJ were mistaken in accepting the wooden and unrealistic test that a publication is required to include a variety of original articles by different authors in order to qualify under the statutory definition of a periodical publication. Measured against the "essential attributes of a periodical test", "Current Contents" qualifies for second class mailing status because of the demonstrated nexus between its periodicity and its contents, *i. e.*, the relationship between its weekly publication and its subscribers receiving the information it contains in a timely and continuous fashion. Under these circumstances, the Postal Service's actions in revoking and denying second class mailing status for "Current Contents" constituted unlawful restrictions of the congressionally prescribed qualifications for second class mailing status.

We will reverse the grant of summary judgment in favor of the Postal Service and remand with a direction for entering summary judgment in favor of ISI.

---

**5.** It is sufficient to observe that, in our opinion, the fact that a publication is issued at stated intervals, under a collective name, does not *necessarily make it a periodical.* . . . While [this fact] may be entitled to weight in determining the character of the publication, it is by no means conclusive, when all their other characteristics are those of books rather than those of magazines.

194 U.S. at 98, 24 S.Ct. at 592.

SEITZ, Chief Judge, dissenting.

This case raises issues of substantial economic moment both to the Postal Service and to publishers. Its disposition turns on the correct interpretation of the Supreme Court's opinion in *Houghton v. Payne*, 194 U.S. 88, 24 S.Ct. 590, 48 L.Ed. 888 (1904). In *Houghton*, the Court was confronted with the problem of whether a series of books, each containing a single work of literature, constituted a "periodical publication" for purposes of the statute governing second class mailing privileges. In considering this question, the Court set forth its reading of the phrase "periodical publications" as follows:

". . . the publication must be a 'periodical publication,' which means, we think, that it shall not only have the feature of periodicity, but that it shall be a periodical in the ordinary meaning of the term. . . . A periodical, as ordinarily understood, is a publication appearing at stated intervals, each number of which contains a variety of original articles by different authors, devoted either to general literature of [sic] some special branch of learning or to a special class of subjects. Ordinarily each number is incomplete in itself, and indicates a relation with prior to subsequent numbers of the same series. It implies a continuity of literary character, a connection between the different numbers of the series in the nature of the articles appearing in them . . . ." 194 U.S. at 96–7, 24 S.Ct. at 592.

The quoted portion of the opinion states that the statutory language must be interpreted on the basis of ordinary usage, and that in ordinary usage each number of a "periodical publication" contains "a variety of original articles by different authors ." The opinion thus states the "variety of original articles" criterion without ambiguity,[1] though as to the requirements that each

number be "incomplete in itself" and that there be "a connection between the different numbers of the series in the nature of the articles appearing in them," the opinion is less definite. The Court based its ultimate decision that the series of books was not a "periodical publication" on these latter criteria of incompleteness and continuity. But I believe we should respect the Court's unambiguous statement that "a variety of original articles" is required, since the Court was endeavoring to set forth the statutory framework within which the question before it arose.

Thus, under *Houghton* we must address the question of whether the Current Contents publications contain "a variety of original articles." I do not understand appellant to contend that they do. Moreover, any such contention would be unsupportable. For the most part, the publications merely present the tables of contents of technical journals. The brief editorials in each issue of "Current Contents" and the short digest of articles in the popular press are insufficient, in my view, to change the nature of the entire publication.

The majority's interpretation of *Houghton* stresses that certain characteristics are found *only* in periodicals, and that it is these characteristics which must be the "definitive test" of what is a "periodical publication." This interpretation embodies a logical fallacy. To say that some characteristics of a periodical are not shared with such publications as books is not to say that all characteristics of periodicals are not shared with some other publications. But to determine whether a particular publication is a periodical, one must look to all the characteristics which periodicals have, and not just to those which are unique to periodicals.

I would affirm the grant of summary judgment in favor of the Postal Service and the denial of ISI's cross-motion.

---

1. The Court did mention *Payne v. Railway Pub. Co.*, 20 App.D.C. 581 (1902), *appeal dismissed* 192 U.S. 602, 24 S.Ct. 849, 48 L.Ed. 583 (1904), where the court treated railroad timetables as "periodical publications." The Court's reference to this case, however, does not indicate that it approved the result: "[a] few other non-descript publications, such as railway guides, appearing at stated intervals, have been treated as periodicals and entitled to the privileges of second class mail matter. *Payne v. Railway Pub. Co.*, 20 App.D.C. 581."