**STANDARD RATE AND DATA SERVICE, INC., Appellant,**

*v.*

**UNITED STATES POSTAL SERVICE et al.**

**No. 77–1848.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 27, 1978.

Decided July 14, 1978.

Timothy J. May, Washington, D. C., with whom David B. Robinson and John L. Oberdorfer, Washington, D. C., were on brief, for appellant.

Kenneth M. Raisler, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty. and John A. Terry, Peter E. George, William H. Briggs, Jr., Asst. U. S. Attys., Washington, D. C., were on brief, for appellees.

Roger A. Clark and George C. Smith, Washington, D. C., were on brief for amicus curiae, The Hearst Corporation, urging reversal.

Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.

Opinion for the court filed by TAMM, Circuit Judge.

Concurring opinion filed by LEVENTHAL, Circuit Judge.

TAMM, Circuit Judge:

Appellant, Standard Rate and Data Service, Inc. (SRDS), seeks review of a decision [1] of the United States District Court for the District of Columbia upholding the revocation by the United States Postal Service (USPS) of the second-class mailing privileges of seven of appellant's publica-

---

1. Joint Appendix (J.A.) at 2–5. The Memorandum and Order granting summary judgment to the appellees and denying summary judgment to appellant is dated July 20, 1977.

tions.[2] We vacate the district court's grant of summary judgment, and remand with instructions to remand to USPS for further proceedings.

## I.  BACKGROUND

The district court stated that SRDS publications

> present detailed information for prospective buyers of advertising in newspapers and magazines, or by radio and television. Data are presented under standardized headings in tabular form broken down by states, cities, towns, or other categories to aid the prospective buyer readily to determine rates, coverage, requirements for placement, and the like.  The publications issue periodically and reflect expertise, care, and editorial analysis in their preparation.  The tabulated material is accompanied by very brief editorial comment.  Some advertising appears with the data.[3]

The postal authorities granted the first SRDS publication entry into the second-class mails in 1919, and, between 1919 and 1970, granted SRDS publications or their predecessors a total of thirty-seven entries, additional entries, or reentries[4] into the second-class mails in twelve different years: 1919, 1922, 1931, 1943, 1951, 1952, 1954, 1956, 1960, 1966, 1967 and 1970.[5]  On January 3, 1975, the Director of the Office of Mail Classification, Rates and Classification Department, USPS, informed SRDS that its second-class privileges were to be annulled

because the publications were not "newspapers [or] other periodical publications." [6] We have not been directed to any record of a revocation or refusal to grant to SRDS the privileges of second-class entry on similar grounds prior to 1975.  Thus, "[t]hese publications had long enjoyed [second-class] privileges, some for over fifty years." [7]

SRDS contested the revocation action pursuant to the procedures of the Rules of Practice in Proceedings Relative to the Denial, Suspension, or Revocation of Second-Class Mail Privileges, 39 C.F.R. § 954 (1977).  After an evidentiary hearing, an administrative law judge (ALJ) held against appellant,[8] finding that its publications do not contain "articles", and, therefore, are not "periodical publications" entitled to second-class mailing privileges.[9]  SRDS appealed the Initial Decision.  The judicial officer of USPS affirmed the ALJ.[10]

Having lost at the administrative level, appellant filed suit in the district court seeking a declaration that its publications are "periodical publications" and an injunction reinstating the second-class entries of its publications.[11]  Both sides moved for summary judgment, and the district court granted the USPS motion.[12]  This appeal ensued.

## II.  THE LEGAL FRAMEWORK

In 1879, Congress provided for mailable matter to be divided into four classes.[13]

---

**2.**  The seven publications at issue are *Business Publications Rates and Data* (published monthly), *Consumer Magazine and Farm Publication Rates and Data* (published monthly), *Newspaper Rates and Data* (published monthly), *Spot Radio Rates and Data* (published monthly), *Spot Television Rates and Data* (published monthly), *Network Rates and Data* (published bi-monthly), and *Print Media Production Data* (published quarterly).  Brief of Appellant, Standard Rate and Data Service, Inc. (SRDS) at 3 n. 1.

**3.**  J.A. at 2–3.

**4.**  *Id.* at 64–65.  There were eighteen original entries and nineteen reentries or additional entries.  *Id.* at 65.

**5.**  *Id.*

**6.**  *Id.* at 15, 66.

**7.**  *Id.* at 2.

**8.**  *Id.* at 14–52.

**9.**  *Id.* at 49–50.

**10.**  *Id.* at 7–13.

**11.**  *Id.* at 53–58.

**12.**  *See* note 1 *supra.*

**13.**  In 1879, Congress provided "[t]hat mailable matter shall be divided into four classes:  First, written matter;  Second, periodical publications;  Third, miscellaneous printed matter;  Fourth, merchandise."  Act of Mar. 3, 1879, ch.

Second-class mail was to include "newspapers and other periodical publications."[14] This descriptive language existed for years, surviving a 1960 congressional revision in the law governing postal matters,[15] and was brought forward in statutory form until 1970 in 39 U.S.C. § 4351 (1964).

In 1970, Congress, in an effort to improve the postal system, passed the Postal Reorganization Act (Act), Pub.L.No.91–375, 84 Stat. 719 (codified at 39 U.S.C. §§ 101–5605 (1970 & Supp. V 1975) and in other scattered sections of *United States Code*). Section 4351 was not reenacted into the statute, but, pursuant to the Act,[16] the language of section 4351 was carried forward in a regulation of the Postal Service, where it remains to date.[17]

The leading case interpreting the term "periodical publication" is *Houghton v.*

*Payne,* 194 U.S. 88, 24 S.Ct. 590, 48 L.Ed. 888 (1904). In that case, the Supreme Court ruled that books that were complete in themselves and had no connection between them were not "periodicals" entitled to second-class mailing privileges just because they issued periodically in a series and were numbered accordingly. 194 U.S. at 98–100, 24 S.Ct. at 593. In its opinion, the Court remarked:

> [T]he publication must be a "periodical publication," which means, we think, that it shall not only have the feature of periodicity, but that it shall be a periodical in the ordinary meaning of the term. . . . A few other nondescript publications, such as railway guides, appearing at stated intervals, have been treated as periodicals and entitled to the privileges of

180, § 7, 20 Stat. 358. This brief general description of second-class mail was not modified in 1925 when Congress altered slightly the classifications of third and fourth class mails. Act of Feb. 28, 1925, ch. 368, §§ 206, 207, 43 Stat. 1067. This general classification section was codified at 39 U.S.C. § 221 (1958), and was included in 39 U.S.C. §§ 4251, 4451, & 4551 (1964) by Act of Sept. 2, 1960, Pub.L.No.86–682, 74 Stat. 578, in which Congress enacted title 39 of the *United States Code* into positive law.

14. Act of Mar. 3, 1879, ch. 180, § 10, 20 Stat. 359.

15. The 1960 revision was Act of Sept. 2, 1960, Pub.L.No.86–682, 74 Stat. 578. Before 1960, this language could be found at 39 U.S.C. § 224 (1958), and, afterward, at 39 U.S.C. § 4351 (1964), which provided: "Second class mail embraces newspapers and other periodical publications when entered and mailed in accordance with sections 4352–4357 of this title."

16. Section 3 of the Postal Reorganization Act, Pub.L.No.91–375, 84 Stat. 719, 773 (1970), provides, in pertinent part: "The classes of mail, the rates of postage, and fees for postal services prescribed by law . . . prior to the effective date of subchapter II of chapter 36 of title 39 [of the U.S.C.] shall be in effect according to the terms of such law . . . until changed in accordance with such subchapter."

Similarly, section 5(f) provides, in pertinent part: "Provisions . . . in effect immediately prior to the effective date of this section, but not reenacted by this Act, shall remain in force as rules and regulations of the Postal

Service . . . to the extent the Postal Service is authorized to adopt such provisions as rules or regulations, until they are revoked, amended, or revised by the Postal Service." 84 Stat. 775.

17. Until 1974, the regulation was published in the *Code of Federal Regulations.* 39 C.F.R. § 132.2 (1974) provided, in pertinent part: "(a) *What may qualify*—(1) *Mailable publications.* Only newspapers and other periodical publications which meet the mailability criteria established in Part 123 may be mailed at the second-class rates." *See* 35 Fed.Reg. 19427 (1970). In 1974, it was decided to incorporate by reference Chapter I of the Postal Service Manual into volume 39 of the *Code of Federal Regulations.* The decision reflected a "change in the manner of publication of Postal Service regulations governing domestic mail service." 39 Fed.Reg. 20595 (1974). This incorporation has been continued through the present time. *See* 39 C.F.R. § 111.5 (1977); 43 Fed.Reg. 22717 (1978).

Section 132.211 of the Postal Service Manual provides: "Only newspapers and other periodical publications which meet the mailability criteria . . . may be mailed at the second-class rates." Record entry 7, at 6.

Further, section 200.1a of the United States Postal Service Domestic Mail Classification Schedule provides, in pertinent part: "Second-class mail consists of properly prepared newspapers and other periodical publications . . . .." *See* Record entry 7, at 7; Decision of the Governors of the United States Postal Service on Establishing a Mail Classification Schedule (June 2, 1976) at 10, 14.

second class mail matter. *Payne v. Railway Pub. Co.,* 20 D.C.App. 581.

.    .    .    .

A periodical, as ordinarily understood, is a publication appearing at stated intervals, *each number of which contains a variety of original articles by different authors,* devoted either to general literature of some special branch of learning or to a special class of subjects. Ordinarily each number is incomplete in itself, and indicates a relation with prior or subsequent numbers of the same series. It implies a continuity of literary character, a connection between the different numbers of the series in the nature of the articles appearing in them, *whether they be successive chapters of the same story or novel or essays upon subjects pertaining to general literature.* If, for instance, one number were devoted to law, another to medicine, another to religion, another to music, another to painting, etc., the publication could not be considered as a periodical, as there is no connection between the subjects and no literary continuity.[18]

18. *Houghton v. Payne,* 194 U.S. 88, 96–97, 24 S.Ct. 590, 592, 48 L.Ed. 888 (1904) (emphasis supplied).

19. There can be no doubt, as found by the district court, that the administrative law judge's (ALJ) decision was predicated on the assumption that *Houghton* created a binding legal standard. *See* J.A. at 3–4. On appeal, the Postal Service maintains that neither the ALJ's decision nor the final postal decision was predicated on such an assumption. Brief *for* Appellee at 9–10. Our examination leads us to the conclusion that the district court was quite correct in this respect. The ALJ stated, in his first Conclusion of Law:

> The issue in this proceeding is whether [the Postal Service] is entitled to revoke or, correspondingly, [SRDS] is entitled to retain, second-class mail privileges for [SDRS] publications. . . . [T]he decision depends on whether [SRDS] publications qualify as "newspapers or other periodical publications" within the meaning of the postal regulations (Postal Service Manual, (PSM), sec. 132.21) and the case law interpreting the same and, in particular, the seminal and leading decision of the United States Supreme

The issue in the case at bar concerns the effect of the "variety of original articles" phrase upon modern interpretation of the "periodical" requirement. More specifically, the issue is whether we may uphold the Postal Service's revocation of appellant's second-class mailing privileges when, in the administrative proceedings, it regarded the *Houghton* "variety of original articles" language as having established an immutable legal standard.[19] Thus, we must determine whether this language in *Houghton* established a legal standard binding in this proceeding requiring the presence of "articles," and, if not, whether we may uphold the Postal Service on a ground other than that upon which the administrative action was apparently predicated.

## III. DISCUSSION

At the outset, we note that the scope of review is wider than the "clearly wrong . . . 'arbitrary,' 'capricious,' [or] 'an abuse of discretion'" test advanced by appellee from *Dell Publishing Co. v. Day,* 113 U.S.App.D.C. 1, 303 F.2d 766 (1962) (per curiam). Appellee fails to distinguish between a situation in which we are called

Court in *Houghton v. Payne,* 194 U.S. 88, 24 S.Ct. 590, 48 L.Ed. 888 (1904).

J.A. at 46; *accord, id.* at 46–49.

The final Postal Service Decision is less than absolutely clear on the weight that it attributes to *Houghton.* The Postal Service argues that the final decision may be read to suggest that the judicial officer did not regard *Houghton* as binding with respect to the alleged "articles" requirement, but rather he concluded that application of the "articles" requirement was "the fairer course to all, the public at large included." Brief for Appellee at 9–10; *see* J.A. at 12. Our examination of the passage relied upon by appellee *leads us to agree with appellant that,* although there is ambiguity, it appears that what is being discussed is the definition of "article," and not that of "periodical." Reply Brief of Appellant, SRDS at 6–9. In affirming, the judicial officer recognized that the ALJ determined that SRDS publications "did not meet the legal standard set forth in the case of *Houghton v. Payne,*" *id.* at 10, and indicated that a more narrow interpretation of *Houghton* had been rejected, *id.* at 13. Thus, we conclude that the judicial officer, as well as the ALJ, regarded the *Houghton* "articles" phrase as binding.

upon to review a Postal Service determination that a particular publication does not meet an established set of criteria and one, as is presented by the case at bar, in which we are called upon to review a determination that certain criteria must be met to qualify for second-class mailing privileges. In departing from *American Bible Society v. Blount,* 446 F.2d 588, 596–98 (3d Cir. 1971), a case relied upon by appellee, the Third Circuit embraces a wider scope of review, when, as in this case, "the administrator's legal decision is based upon his interpretation of a judicial opinion that in turn construes a statute." *Institute For Scientific Information, Inc. v. United States Postal Service,* 555 F.2d 128, 132 (3d Cir. 1977). What is involved in this case is both the meaning and the effect of the language of a Supreme Court opinion. We agree with the Third Circuit that the resolution of this type of question does not require the same type and degree of deference to administrative discretion as was involved in *American Bible Society v. Blount.*

The fact that *Houghton v. Payne* does not establish a rule binding in this proceeding is evident from an examination of the text of Mr. Justice Brown's opinion in *Houghton v. Payne,* subsequent Supreme Court interpretation, subsequent lower court interpretation, and administrative practice.

■ Commencing our analysis with *Houghton v. Payne* itself, it is plain that the Supreme Court was making the distinction between periodicals and a series of books published periodically. In the words of Mr. Justice Brown, what was involved in *Houghton* was the "line of demarkation between periodicals and books." *Houghton v. Payne,* 194 U.S. at 97, 24 S.Ct. at 592. The limits of the "articles" language are fixed by its purpose. The Court was not called upon, nor did it intend, to give a definition of "periodical" binding for all time, for all future statutes and regulations, for all publications, for all circumstances, and, in giving a narrow definition to the issue, *id.,* it implicitly so recognized.

The very sentence containing the "variety of original articles" language, however insightful an observation it may contain, does not itself purport to be more than a mere observation. The sentence limits its own application by stating that "as ordinarily understood," a "periodical" contains "articles." *Id.* It does not say that periodicals *must* contain "articles," nor does it even observe that they always do.

Although the Court had previously stated that a publication must be "a periodical in the ordinary meaning of the term," 194 U.S. at 96, 24 S.Ct. at 591, it did not intend, in our view, to make a mandatory, logical linkage by use of the phrase "as ordinarily understood." The tone of the opinion suggests that the Court, in describing "[a] periodical, as ordinarily understood," was attempting merely to make a scholarly, empirical set of observations. Having established that ordinary usage controls, the Court immediately gave two dictionary definitions of "periodical," and then discussed the "newspaper" and "railway guide" exceptions. 194 U.S. at 96–97, 24 S.Ct. 590. Thus, the Court did not physically link its "articles" formulation to its statement that ordinary usage will govern the outcome, nor did it explicitly or implicitly make such a logical nexus.

On the contrary, the use of "as ordinarily understood" demonstrates that the Court was making an observation and not a rule of law, and the Court contemplated cases other than those covered by its observation. This interpretation is reinforced substantially by the Court's citation of *Payne v. National Railway Publishing Co.,* 20 App. D.C. 581 (D.C.Cir. 1902), *appeal dismissed,* 192 U.S. 602, 24 S.Ct. 849, 48 L.Ed. 583 (1904). 194 U.S. at 96–97, 24 S.Ct. 590. In that case, railroad guides that appeared at regular intervals were accorded second-class mailing privileges, 20 App.D.C. at 600, and the Supreme Court in *Houghton* cited this fact with approval. 194 U.S. at 96–97, 24 S.Ct. 590. If a publication must be a "periodical" in order to gain entry to the second-class mails, *see id.* at 96, 24 S.Ct. 590, and a railroad guide is entitled to second-class entry, surely it is not entirely consistent to

assert that a "periodical" *must always* be composed of "a variety of original articles," unless somehow the entries in the railroad timetable are to be regarded as "articles," a proposition for which we can find no support in *Houghton.*

To recapitulate, the rule of *Houghton v. Payne* is simply that books published at regular intervals are not "periodical publications" because each number of the series is complete in itself and because there is no logical connection between the contents of one number and that of the other numbers in the series. The limited nature of the *Houghton* rule is demonstrated in Mr. Justice Brown's opinion in a companion case, *Bates & Guild Co. v. Payne,* 194 U.S. 106, 107, 24 S.Ct. 595, 596, 48 L.Ed. 894 (1904):

> Conceding the principle established in [*Houghton v. Payne* and *Smith v. Payne,* 194 U.S. 104, 24 S.Ct. 595, 48 L.Ed. 893 (1904)] to be that the fact that books published at stated intervals and in consecutive numbers do not thereby become periodicals . . . cases may still arise where the classification of a certain publication may be one of doubt.

Not only does Mr. Justice Brown give a narrow reading to his own opinion in *Houghton,* but he readily asserts that instances of doubt may continue to occur, an assertion militating against the broad reading of *Houghton* urged upon us by the Postal Service.

The Supreme Court once again faced an issue concerning entry into the second-class mails in *Smith v. Hitchcock,* 226 U.S. 53, 33 S.Ct. 6, 57 L.Ed. 119 (1912). In affirming the Postmaster-General's revocation of the second-class mailing privileges of appellants' publications, Mr. Justice Holmes gives, as the rule of *Houghton:*

> [N]ot every series of printed papers published at definite intervals is a periodical publication within the meaning of the law, even if it satisfies the conditions for admission to the second class . . . [citation omitted]. It is established by the same authorities, that books, that are expressly embraced in mail matter of the third class . . . cannot be removed

from that class and brought into the second by the simple device of publishing them in a series at regular intervals of time.

226 U.S. at 58–59, 33 S.Ct. at 8. Thus, Mr. Justice Holmes appears to concur in a narrow reading of the rule of *Houghton.* Moreover, having indicated the Court's intention to adhere to *Houghton,* 226 U.S. at 58, 33 S.Ct. 6, he goes on to say:

> The noun "periodical," according to the nice shade of meaning given to it by popular speech, conveys at least a suggestion if not a promise of matter on a variety of topics, and certainly implies that no single number is contemplated as forming a book by itself. . . . It hardly would be an exception if, where the object is information and the subject-matter is a changing one, a publication periodically issued giving information for the time should be held to fall into the second class.

*Id.* at 59–60, 33 S.Ct. at 8. If the critical *Houghton* passage were a rule, and if the Court were attempting to follow the *Houghton* formulation, then the subsequent description of periodicals would be, at best, superfluous. Indeed, if *Houghton* is read immutably to define "periodical," *Smith v. Hitchcock* may be read as at variance with *Houghton* because *Smith* makes no mention of an "articles" requirement, and because *Smith* appears to undertake an independent description.

A recent and important case to deal with the "articles" question is *Institute For Scientific Information, Inc. v. United States Postal Service,* in which the Third Circuit holds, *inter alia,* that "articles" are not necessary. The court holds explicitly that the *Houghton* "articles" language was not intended, and should not be interpreted, as a rule of law, and that the presence of "articles" was merely one factor that the Supreme Court had considered in reaching its conclusions in *Houghton.* Importantly, the Third Circuit rejects flatly the notion that the postal authorities have followed a long-standing, consistent, judicially accepted course of requiring "articles." 555 F.2d at 130–32.

Appellee cites *Dell Publishing Co. v. Summerfield,* 198 F.Supp. 843 (D.D.C.1961), *aff'd sub nom. Dell Publishing Co. v. Day,* 113 U.S.App.D.C. 1, 303 F.2d 766 (1962) (per curiam), as controlling judicial precedent supporting the "articles" requirement. Although we see that the *Dell* decisions do cloud the waters slightly, we think that appellee reads too much into them. It is true that Judge Holtzoff quotes the *Houghton* description approvingly, and that this court unanimously affirms in a short per curiam decision. However, the texts of the opinions do not reveal, in any manner whatsoever, that the facts present the same issue as the case at bar—that is, whether the presence of "articles" is a rock-bottom requirement.

It appears that Judge Holtzoff relies on the absence of "articles" as a factor in a more extended analysis. Indeed, immediately after quoting the disputed language from *Houghton,* he quotes the description of *Smith v. Hitchcock,* which unmistakably implies that he does not regard *Houghton* as exclusively controlling. In response to appellee's assertion that the *Houghton* "articles" formulation became the law of the circuit, it would be a sufficient answer to say that, to the extent appellee is correct, the *Smith* formulation, which does not impose the "articles" limitation, became the law of the circuit simultaneously.

However, we do not think that either case became the law of the circuit in the sense that appellee suggests. To quote the *Houghton* passage approvingly is not equivalent in logic or in law to an assertion that the passage establishes a black letter "articles" requirement. Rather, we must go beyond a superficial exploration to examine the use to which the quoted language was put. Appellee fails to make this essential distinction.

The past administrative practice of the postal authorities is not a factor militating in favor of the Postal Service in these proceedings. Despite its insistence that the "articles" requirement antedates 1974, and its citation of a few administrative cases to support its proposition, Brief for Appellee at 15–20, the fact remains that SRDS publications appear to have enjoyed entry into the second-class mails for over fifty years. The district court noted this fact, and that the revocation was not occasioned by any alteration in the publications themselves. Joint Appendix (J.A.) at 2. The court attributed the revocation to what is apparently a fairly comprehensive review by the Postal Service of past practices and the development of a new standard in the course of this review. *Id.* at 4; *see id.* at 2. The Postal Service maintains that *Houghton* established an "articles" standard, a standard that has been followed consistently ever since. The comprehensive review is explained as "an attempt to become more fiscally responsible, [in which the Postal Service] began a more systematic and rigorous enforcement of the articles standard in an effort to ensure that only eligible publications enjoyed subsidized second-class rates." Brief for Appellee at 16 n.12. In essence, then, we are to believe that the thirty-seven entries, additional entries, or reentries represent an incredible succession of administrative blunders. We agree with the Third Circuit, *Institute For Scientific Information, Inc. v. United States Postal Service,* 555 F.2d at 132, and with the district court in this case, that the facts before the court indicate that there has been, in fact, a switch in postal policy, and we believe that this is clearly demonstrated by the dramatic departure from treatment traditionally accorded to SRDS and its publications. In a sense, the assertion that the Postal Service is engaged in a systematic general review is itself a partial admission that the de facto policy of the Postal Service and its predecessor did not require "articles."

A further example of the confusion that has permeated the administrative history of the term "periodical" is provided by *Florists' Transworld Delivery Association* (P.S. Docket No. 1/167). In the Postal Service Decision in that case, which is dated May 24, 1974, the judicial officer noted that the postal authorities have struggled with the "periodical" problem for years. Separate Appendix of Appellant, SRDS at 60. The judicial officer stated that a listing format should not *per se* preclude a publication from entry into the second-class mails. *Id.*

at 61–64. Subsequently, in an Amended Postal Service Decision in the same case, dated September 17, 1974, an acting judicial officer reversed the Postal Service Decision on this point.[20] *Id.* at 72–109.

In this case, the district court determined, contrary to the position of the ALJ, that *Houghton* did not create an immutable rule requiring the presence of "articles," but affirmed nevertheless under the theory that the Postal Service was free to promulgate new standards, and had effectively done so. J.A. at 3–5. We agree that the ALJ misconstrued the effect of *Houghton* in these proceedings, but we find ourselves unable to affirm.

To the extent that the final administrative action is founded on a misconception of the effect of *Houghton, see* note 19 *supra,* the district court affirmed on a legal rationale quite different from that of the agency—the district court viewed the judicial officer as formulating a standard while the judicial officer thought himself hemmed in by *Houghton.* The disparity is not without significance.

■ It is axiomatic that a reviewing court may not substitute a fresh reasoned basis for administrative action when the basis relied upon by the administrative agency has been discredited in the judicial proceedings. *SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *accord, Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 270, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960); *Ashland Oil, Inc. v. FTC,* 179 U.S.App.D.C. 22, 26, 548 F.2d 977, 981 (1976) (per curiam). The application of this principle in this case appears to make a good deal of sense. A basic rationale for the rule is, of course, that the administrative agency may have acted differently had it recognized that one or more of its premises was faulty. In this instance, we cannot say with any assurance that the ALJ and the judicial officer would have acted similarly had they not followed that which they perceived as the absolute mandate of *Houghton.*

Equally important in this case, moreover, is that a remand will give USPS an opportunity to develop, or at least to articulate, a more consistent, and perhaps more purposeful, policy with respect to entry into the second-class mails. Our review of the record of this case and of the arguments of the parties gives us little direction with respect to some of the basic teleological questions involved. Whereas it is evident that any resolution depends upon an interpretation of "periodical," and that certain legal guideposts are and have been regarded as aids in construction, the Postal Service has presented little, if any, information with respect to its view of the general purposes of second-class mail service, and the specific ends to be served by granting or denying entry into the second-class mails.

The explanation of the USPS in its brief that it is attempting to become more responsible financially, is, it seems to us, an explanation that is not in any way specific to appellant, or even to all users of the second-class mails whose publications do not contain "articles." Financial responsibility is a consideration that could apply to any item carried by the Postal Service.[21] In effect, the Postal Service brief suggests that the Postal Service undertook, with financial considerations in mind, a wide-ranging review of publications entered or seeking entry into the second-class mails, and that it reversed its position with respect to SRDS publications for financial reasons. We do not see where this explanation was offered in the final decision, and, therefore, we could not uphold the Postal Service on this general basis, even were we so inclined.

We make these observations without deciding whether the Postal Service would be free to adopt an "articles" requirement unilaterally in proceedings such as those under review, or, as argued by appellant, the Postal Service would have to employ the techniques given in Chapter 36 of the Act, 39 U.S.C. §§ 3601–3685 (1970 & Supp. V 1975), or whether the Postal Service would be barred by the "phasing" provision, 39 U.S.

---

**20.** The amended decision was affirmed in *Teleflora, Inc. v. United States Postal Service,* Civil No. 75–228 (D.D.C. June 25, 1975).

**21.** *See generally* 39 U.S.C. §§ 101(d), 3622(b)(3) (1970).

C.A. § 3626(a) (1978). Further, we need not, and expressly do not, make any intimation ·concerning what rationale would suffice to support a modification of the second-class eligibility requirements.

■ To the extent that the final agency action is not predicated on a reading of *Houghton* similar to that of the ALJ, a remand is necessary for lack of a sufficiently clear explanation. In order to make possible any effective judicial review, there must be reasoned findings. *Baltimore & Ohio Railroad v. Aberdeen & Rockfish Railroad,* 393 U.S. 87, 92, 89 S.Ct. 280, 21 L.Ed.2d 219 (1968). The Postal Service must articulate clearly and precisely the reasons for its decision. *SEC v. Chenery Corp.,* 332 U.S. at 196–97, 67 S.Ct. 1575, 91 L.Ed. 1995; *Nader v. NRC,* 168 U.S.App. D.C. 255, 261, 513 F.2d 1045, 1051 (1975). It is true that we may uphold an agency decision, despite a lack of precision, where its path is reasonably clear, *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281,·285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), but this is plainly not such a case. We believe that the final decision rested upon a reading of *Houghton* that required "articles," but, to the extent that it can be said that it did not, its basis is unclear. Although it is true that, if the Postal Service had been mistaken in repeatedly allowing SRDS publications entry into the second-class mails, there would be no entitlement to have the Postal Service repeat its error, *see Chem-Haulers, Inc. v. ICC,* 184 U.S.App.D.C. 153, & n. 14, 565 F.2d 728, 730 & n. 14 (1977), there is a sufficient departure from past policy with respect to SRDS that we believe the Postal Service must make a rational explanation for its departure. *Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (principal opinion) (Marshall, J.); *Greater Boston Television Corp. v. FCC,* 143 U.S.App. 383, 396, 444 F.2d 841, 852 (1970), *cert. denied,* 403 U.S. 923, 92 S.Ct. 2233, 29 L.Ed.2d 701 (1971). Thus, no matter how the Postal Service decision is viewed, a remand is necessary.

For the foregoing reasons, the decision granting summary judgment is vacated and remanded with instructions to remand to the Postal Service for further proceedings consistent with this opinion.

*So ordered.*

LEVENTHAL, Circuit Judge, concurring:

I fully concur in Judge TAMM's opinion for the court.

I take advantage of the latitude of a concurring opinion to say what may be inappropriate for a mandate of the court. There is considerable doubt, to say the least, whether and under what circumstances a court may direct an agency to proceed by way of rulemaking rather than by establishing standards in a context of case-by-case decisionmaking.[1] But a concurring judge may at least observe that if the scope of "periodical publications" is handled through a rulemaking procedure, it is less likely to run into the danger of lack of adequate explanation for the administrative determination. Moreover, rulemaking assures that any modification in position will represent a generalized approach to a general problem, avoiding the uneasiness that results from the greater possibility of discrimination in a case-by-case approach.[2]

In a rulemaking proceeding, the Postal Service would be free to propose a rule defining periodical in terms of the concept of variety of articles or topics, and to consider that proposal in the light of comments. Such a proposal would use a definition that links periodical with newspaper in terms of the kind of information published; this might be predicated on a judgment that such reading material is more worthy

---

1. *See SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). In *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), six justices disapproved of the issuance of legislative-type rules of general application in the course of adjudicatory proceedings.

2. *City of Chicago v. FPC,* 128 U.S.App.D.C. 107, 122–23, 385 F.2d 629, 644–45 (1967), *cert. denied,* 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968).

of favorable rate consideration. There may be better reasons. In any event, there would be opportunity for comment by the industries that have established positions in reliance on the old rule.

Financial considerations are not irrelevant for the Postal Service, given its overall charge to run the postal service more like a business than heretofore. Those running a business often reconsider price differentials, and not infrequently undertake to revise differentials that have slipped into its schedules, through error, accident or reasons that were good in the past. The course of revision may prune away advantages enjoyed by certain customers that cannot be justified by reasons having current vitality. The Postal Service is not in exactly the same position as a private business because to some extent it must follow procedures and meet standards applicable to government agencies. But the law strives for an accommodation that will provide the best and not the worst of both worlds.