696 F.2d 572
 Edward S. DANKS, John Fredericks, Maurice Danks, Dennis
Snow, Lyle Danks, Curtis Danks, Clayton Danks, Emerson
Chase, Ron Brugh, Williams Hall, Sr., Joe Chase, Bobbie
Chase, Dennis Huber, Judy Fredericks, and Fort Berthold Land
and Livestock Association, a Corporation, Appellants,
v.
Harrison FIELDS, Acting Superintendent of the Fort Berthold
Indian Reservation; Harley Zephier, Area Director of the
Aberdeen Office of the Bureau of Indian Affairs; Cecil
Andrus, Secretary of the Interior, or Any of Their
Successors, Agents or Employees, Appellees.
 No. 82-1303.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 10, 1982.
Decided Dec. 28, 1982.
 
 Thomas K. Schoppert, Schoppert Law Firm, New Town, N.D., for appellants.
 Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., Rodney S. Webb, U.S. Atty., Charles S. Miller, Jr., Asst. U.S. Atty., Fargo, N.D., Dirk D. Snel, Nancy B. Firestone, Attys., Dept. of Justice, Washington, D.C., for appellees.
 Before HEANEY, JOHN R. GIBSON and FAGG, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 This appeal involves a controversy over grazing fees established by the Bureau of Indian Affairs (BIA) for land on the Fort Berthold Indian Reservation in North Dakota. The BIA issued grazing permits for that land in November, 1976, which expired on October 30, 1980. In October, 1979, the BIA announced that the annual grazing fee for the fourth and final year of the permit term would be increased from $42 per animal unit to $57 per animal unit. The plaintiffs unsuccessfully sought to have the fee increase set aside in administrative proceedings in the Department of Interior and in the district court.[1] Because we find that the fee increase violated the terms of the permits the BIA issued in 1976, we reverse the judgment of the district court.
 
 I.
 BACKGROUND
 
 2
 The plaintiffs are fourteen ranchers, who are enrolled members of the Three Affiliated Tribes, and the Fort Berthold Land and Livestock Association, a nonprofit corporation representing the individual plaintiffs as well as other ranchers on the Fort Berthold Indian Reservation. The defendants are officers and employees of the Department of Interior and the BIA, who are charged with administering the grazing permit program.
 
 
 3
 Pursuant to federal laws, 25 U.S.C. Secs. 393, 397, 403 & 466, and regulations, 25 C.F.R. Secs. 151 et seq.,[2] the Secretary of the Interior, through the BIA, administers grazing lands held in trust for individual Indians and for Indian tribes.[3] Under the regulations, the BIA Area Director must "establish a reservation minimum acceptable grazing rental rate" for land owned by the government or individual Indians which will "provide a fair annual return to the land owners." 25 C.F.R. Sec. 151.13(b). For tribally owned lands, however, the tribe's governing body may set the grazing rate. 25 C.F.R. Secs. 151.4, 151.13(b).
 
 
 4
 In August, 1976, the Tribal Council for the Affiliated Tribes of the Fort Berthold Reservation established for the 1976-1980 grazing seasons an annual grazing fee of $27 per animal unit for tribally owned lands and recommended a $36 per animal unit annual fee for individually owned lands. The BIA Area Director rejected this recommendation, and set the grazing fee for individually owned land at $42 per animal unit per year. In addition, the Area Director modified all of the grazing permits to expressly provide:
 
 
 5
 That grazing permits shall be issued for a four (4) year contract period beginning November 1, 1976, and terminating October 31, 1980. Grazing fees shall be re-evaluated in accordance with 25 C.F.R. by August 1, prior to the beginning of the fourth year and such rate shall prevail for the balance of the permit period. [Emphasis added.]
 
 
 6
 On October 3, 1979, nearly two months after the deadline contained in the permits, the BIA Area Director announced that the grazing fee on individually owned land for the 1979-1980 season, which began in November, 1979, would be increased from $42 to $57 per animal unit.
 
 
 7
 When the individual plaintiffs received notice of the fee increase, they stated their intention to refuse to pay it. After the fees for the 1979-1980 grazing season came due on November 1, 1979, the Superintendent of the Fort Berthold Reservation moved to cancel the permits held by members of the Fort Berthold Land and Livestock Association (hereafter Association) because they refused to pay a grazing fee higher than $36 per animal unit. The Superintendent also advertised the availability of the range units held by the Association members, demanded that the members either pay the new fee or abandon the land they held, and threatened at least some members with trespass suits if they did not accede to his demand. Ultimately, the fourteen individual plaintiffs removed their cattle and placed the livestock on other ranges or in feed lots. Other Association members paid the fee under protest.
 
 
 8
 The plaintiffs--both the individual ranchers and the Association--then began pursuing this appeal. In January, 1980, they requested the BIA Area Director to rescind the fee increase. He transferred the matter to the Commissioner of Indian Affairs, who in turn transferred it to the Interior Board of Indian Appeals (IBIA).
 
 
 9
 While the matter was pending in the IBIA Hearing Division, the plaintiffs filed an action in the district court to set aside the fee increase and to enjoin the defendants from enforcing the new rate. The district court issued a preliminary injunction against the fee increase, but ordered the individual plaintiffs to deposit five-sixths of the new fee with the BIA as security pending the final resolution of this matter.[4] The district court also ordered the defendants to allow the individual plaintiffs to return their cattle to their range units for the balance of the original permit period if they posted the security.[5]
 
 
 10
 Thereafter, the IBIA, reversing the decision of the administrative law judge (ALJ) in its Hearing Division, held that the fee increase was valid even though it was announced after the August 1, 1979, deadline set in the permits. The IBIA remanded the matter to an ALJ for a hearing on the reasonableness of the increase. After the hearing, the ALJ recommended the annual fee be reduced from $57 to $52 per animal unit. The IBIA, however, rejected the ALJ's recommendation, and upheld the BIA's $57 fee. The plaintiffs then filed an amended complaint in the court below seeking an order establishing an annual $36 per animal unit fee and directing return of the amount in excess of that rate held by the BIA. The district court granted the defendants' motion for summary judgment, and affirmed the fee increase.
 
 
 11
 The plaintiffs now appeal, claiming that the fee increase is invalid on three grounds: (1) it was announced after August 1, 1979; (2) it was issued in violation of their rights to due process; and (3) it is unreasonable.
 
 II.
 DISCUSSION
 
 12
 The plaintiffs contend that the fee increase was invalid because the BIA violated the terms of the grazing permits by announcing the increase on October 3, 1979, two months after the August 1 deadline set in the permits.[6]
 
 
 13
 The IBIA rejected this claim in the administrative proceedings below, ruling that the permits did not require the BIA to make any fee increases by August 1, 1979. The IBIA found that the August 1 deadline in the permits was merely a nonbinding "goal" or "objective" for the completion of re-evaluations. The district court affirmed the IBIA's decision on the basis of the agency's opinion.
 
 
 14
 Generally, a BIA decision to increase grazing permit fees cannot be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A); First National Bank of Fayetteville v. Smith, 508 F.2d 1371, 1373-1376 (8th Cir.1974), cert. denied, 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975). See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971) ("substantial evidence" standard of review applies only to agency determinations on the record after a hearing required by statute or agency action taken after a public adjudicatory hearing).
 
 
 15
 We recognize that some agency decisions are "primarily of a judgmental or predictive nature," and that "complete factual support in the record for the [agency's] judgment or prediction is not required." F.C.C. v. National Citizens Committee for Broadcasting, 436 U.S. 775, 813-814, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978). This matter, however, does not present such a situation. In rejecting the plaintiffs' claim that the BIA could not validly increase the grazing fee after August 1, 1979, the IBIA based its decision on its interpretation of written documents--the grazing permits, not its judgment regarding policy within its area of expertise. Cf. id. See Davis, Administrative Law Treatise, Sec. 14.28 (2d ed. 1979). It is settled that the interpretation of a written document is a question of law to be determined by the courts. Federal-Mogul Corp. v. N.L.R.B., 566 F.2d 1245, 1256 (5th Cir.1978). Although we are free to adopt an agency's construction of such a document, we are not bound to do so. Id. Here, we believe that the IBIA plainly erred in concluding that the August 1, 1979, deadline contained in the permits was a nonbinding goal. As discussed below, the permits' plain language shows that the deadline was mandatory, and the record does not support any other interpretation.
 
 
 16
 The first justification advanced by the IBIA for its decision was that "the plain wording of the permit does not convey the stipulation that new fees may be pronounced by August 1, 1979, but not thereafter." We cannot agree.
 
 
 17
 The grazing permits explicitly provide that the "grazing fees shall be re-evaluated * * * by August 1." Contrary to the view of the IBIA, this provision clearly indicates that any change in fees must be made and announced by August 1, 1979. The word "shall" cannot be fairly interpreted as presenting the BIA with a voluntary choice of action; its use in the permits plainly shows that the agency's obligation to complete the re-evaluation by August 1 was mandatory. See Coomes v. Adkinson, 414 F.Supp. 975, 987, 993 (D.S.D.1976).
 
 
 18
 Moreover, there is not even the slightest shred of evidence in the record indicating that the BIA Area Director intended the August 1 deadline to be a nonbinding "goal" or "objective" when he included it in the permits. In fact, at oral argument, the defendants conceded that the deadline's purpose was to protect Indian ranchers by requiring the re-evaluation to be completed prior to the November 1 due date for fees, thereby enabling the ranchers to make intelligent and informed decisions concerning the 1979-1980 grazing season.[7] This purpose would be defeated if we allowed the IBIA's interpretation of the permits to stand.
 
 
 19
 The defendants alternatively attempt to bolster the IBIA's interpretation of the permits by contending that the August 1 deadline was for the completion of the re-evaluation, not for the announcement of the price increase. This contention is simply untenable. Common sense dictates that the fee re-evaluation process would culminate in the public announcement of any changes. There is no record evidence suggesting that the BIA Area Director contemplated having separate re-evaluation and announcement deadlines when he included this provision in the permits. Nor has the IBIA advanced any explanation--plausible or otherwise--why the Area Director would establish such separate deadlines. This Court has no authority to provide justifications for administrative actions when the agency has failed to do so. Oglala Sioux Tribe of Indians v. Andrus, 603 F.2d 707, 715 & n. 7 (8th Cir.1979); Standard Rate & Data Service, Inc. v. United States Postal Service, 584 F.2d 473, 481 (D.C.Cir.1978).
 
 
 20
 The IBIA's second rationale for its interpretation of the permits was that
 
 
 21
 since there is no legal requirement that permittees be given prior notice of grazing fee increases, it is not unreasonable to conclude that the August 1 date cited in the permit refers merely to a goal or objective for the completion of fee re-evaluations. [Footnote omitted.]
 
 
 22
 Again, we cannot agree.
 
 
 23
 Although the applicable statutes and regulations, 25 U.S.C. Secs. 393, 397, 403 & 466; 25 C.F.R. Secs. 151 et seq., may not have required notice to the individual permit holders--a question we need not decide here, this fact is irrelevant. The question here is not whether the federal statutes and regulations required the BIA Area Director to establish the August 1 deadline and include it within the permits received by the plaintiffs. Plainly, they did not. Nonetheless, the Area Director set that deadline and made it an explicit term of each permit he issued. The defendants are not now free to ignore these terms simply because they found them to be inconvenient.
 
 
 24
 Finally, the defendants attempt to excuse their failure to comply with the terms of the permits by claiming that the plaintiffs suffered no prejudice from the delay in the announcement of the price increase. The defendants suggest that the plaintiffs were fully protected by the administrative appeal and stay procedures available to them. This argument ignores the record here. In fact, the plaintiffs were improperly denied access to the BIA's administrative appeal and stay procedures, and they did not obtain effective injunctive relief until March, 1980, when they brought suit in the district court. In the meantime, however, the defendants cancelled the individual plaintiffs' grazing permits, and they were forced to remove their livestock from the range units involved here.
 
 
 25
 During the period of approximately December 17-26, 1979, the BIA notified the individual plaintiffs that their grazing permits had been cancelled for nonpayment of the fee for the 1979-1980 season. The BIA also informed them that if they did not immediately remove their livestock from the range units involved here, they would be subject to trespass lawsuits and penalties, and the grazing permits they held for other range units might be cancelled. The individual plaintiffs promptly appealed to the BIA Area Director, but he dismissed their appeal, ostensibly for failure to notify interested parties as required by 25 C.F.R. Sec. 2.11(a). Although the individual plaintiffs disputed the finding that they failed to give the required notice, they abandoned their appeal and removed their cattle from the range units under the BIA's threatened penalties.
 
 
 26
 The plaintiff Association filed an administrative appeal with the BIA Area Director on November 5, 1979. He simply stood on his October 3 decision to increase the fee. The appeal was then transferred to the Commissioner of Indian Affairs, who, on February 1, 1980, transferred the matter to the IBIA. Finally, on February 13, 1980, the IBIA suspended the fee increase as of that date and set the matter for a hearing. This February, 1980, suspension, however, provided no relief to the individual plaintiffs who previously had their grazing permits cancelled and had removed their cattle from the range units in December, 1979.
 
 
 27
 The plaintiffs, having failed to obtain any meaningful relief from the defendants, instituted their action for injunctive relief in federal district court in March, 1980. The district court, of course, finally ordered the defendants to stay the fee increase, to reinstate the individual plaintiffs' permits, and to allow them to return their livestock to the range units.[8]
 
 
 28
 Thus, as a result of the defendants' action and inaction, the individual plaintiffs had their grazing permits cancelled; were threatened with lawsuits, penalties and the loss of their permits for other range units; and were forced to bear the cost and inconvenience of relocating their livestock and obtaining alternative feeding sources. Moreover, the defendants' failure to comply with the August 1 deadline seriously impaired the ability of the individual plaintiffs, as well as the other members of plaintiff Association, to prepare and plan intelligently for the 1979-1980 grazing season. At oral argument, the defendants did not deny the plaintiffs' contention that the August-October period is crucial for Indian ranchers because during that time, the ranchers sell cattle and make their decisions concerning the forthcoming grazing season. They must decide, for example, how to spend the proceeds from the previous season's sales, how many cattle to graze, what size range units to apply for, what land--government, individual or tribal--to include in their range units, and whether to apply for Farmers' Home Association loans. In a volatile, low-profit, low-yield market like the one in which the plaintiffs are engaged, any delay adversely affecting their ability to make intelligent and informed business judgments is not insignificant.
 
 
 29
 Accordingly, we cannot agree with the defendants that the plaintiffs were not prejudiced by the BIA Area Director's failure to meet the deadline for the fee increase. We thus find no merit to any of the defendants' arguments for sustaining the IBIA's decision that the defendants could validly increase the grazing fee after August 1, 1979.
 
 
 30
 Therefore, the IBIA's decision, and the district court's judgment affirming it, are reversed.[9] We remand this matter to the district court to fashion appropriate relief.
 
 
 
 [1]
 The Honorable Bruce Van Sickle, United States District Judge for the District of North Dakota
 
 
 [2]
 The regulations discussed here are those that were in effect for the 1978-1979 grazing season
 
 
 [3]
 The federal regulations require the BIA to administer grazing lands on Indian reservations through a permit program. The Fort Berthold Indian Reservation contains land owned by individual Indians, by the Three Affiliated Tribes, and by the United States government. For administrative purposes, the BIA divides the reservation land into "range units," which may consist of individual, tribal, or government property, or any combination of the three. In order to graze livestock on a range unit, persons, except for Indians using land which they individually own, must obtain a permit from the BIA. The BIA issues permits for livestock grazing on all range units (except for tribally owned or controlled land allocated by the tribal governing body and for individually owned land utilized by its owners) on either a competitive bidding or negotiated sale basis. The BIA establishes the fee for grazing permits in terms of "animal units," which consist of "one adult cow with unweaned calf by her side or the equivalent thereof based on comparable forage consumption." 8 I.B.I.A. 230, 233 (1981). The maximum duration of grazing permits is generally five years. The permit fee must be paid annually in advance, and the due date is set in the permit. See 25 C.F.R. Secs. 151 et seq
 
 
 [4]
 The defendants contended that the district court lacked jurisdiction because the plaintiffs had not yet exhausted their administrative remedies. The district court rejected this contention because the BIA had ordered the plaintiffs to remove their cattle from the range units under threat of trespass penalties, and because the BIA was preparing to issue the permits to new permit holders. The defendants did not appeal from this ruling
 
 
 [5]
 The record is unclear on whether the individual plaintiffs in fact paid five-sixths of the new fee and returned their cattle to the range units
 
 
 [6]
 The plaintiffs do not contend on appeal that the defendants lacked authority under 25 C.F.R. Secs. 151 et seq., to establish a four-year grazing permit period, and to re-evaluate and increase the permit fee after the third year. Their challenge is simply that the increase was invalid because the BIA Area Director failed to comply with his own self-imposed deadline for charging the permit fee
 
 
 [7]
 Before the BIA issued the permits for the 1976-1980 grazing seasons, the tribal governing body proposed that the permits include the following term regarding re-evaluation:
 
 
 [1]
 That grazing permits shall be issued for four (4) years contract period beginning November 1, 1976, and terminate October 31, 1980, with a re-evaluation period after three years
 The BIA Area Director, however, rejected this proposal, and substituted the term which provides the set August 1 deadline. Counsel for the defendants also conceded at oral argument that the Area Director rejected the Tribal Council's proposal because it did not establish a firm re-evaluation deadline and, hence, it was impractical and offered permit holders no protection for their planning needs.
 
 
 [8]
 In the proceedings for injunctive relief, the district court also held that the BIA Area Director abused his discretion by effectively denying plaintiff Association a review and means to obtain a stay in violation of 25 C.F.R. Secs. 2.3(b), 2.17 & 2.18. It found that the Area Director did not abuse its discretion in dismissing the individual plaintiffs' appeal, but only because they failed to provide any evidence of the appeal procedures they pursued. None of the parties appealed these findings
 
 
 [9]
 In light of our holding, we need not reach the other grounds for reversal urged by the plaintiffs